[No. S004777. Crim. No. 26411. Aug. 21 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DARREN CHARLES WILLIAMS, Defendant and Appellant.

636

640

COUNSEL

Nicholas C. Arguimbau, under appointment by the Supreme Court, and Maureen M. Bodo for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Susan Lee Frierson and Sanjay T. Kumar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—This is an automatic appeal from a judgment of death. (Pen. Code, § 1239, subd. (b); all further statutory references are to the Penal Code unless otherwise indicated.)

A jury convicted defendant Darren Charles Williams of four counts of first degree murder. (§ 187.) But the jury failed to reach a verdict on the special circumstance allegation of multiple murder. (§ 190.2, subd. (a)(3).) The special circumstance allegation was then tried before a second jury, which found it to be true and returned a verdict of death. The trial court denied defendant's automatic motion to modify penalty (§ 190.4, subd. (e)), and sentenced him to death.

We affirm the convictions of four counts of first degree murder, but prejudicial error in the retrial of the special circumstance allegation requires that we set aside the jury's finding on the special circumstance and reverse the judgment of death.[1]

## I. FACTS AND PROCEEDINGS

Early in the morning of August 31, 1984, 58-year-old Ebora Alexander died in her South Central Los Angeles home from multiple gunshot wounds to the head. Three other household members—the victim's twenty-four-year-old daughter, Dietria Alexander, and two visiting grandsons, thirteen-year-old Damani Garner and eight-year-old Damon Bonner—were shot and killed in their beds.

[1]In 1991, we affirmed the death sentence of Tiequon Cox, who was the actual perpetrator of the murders in this case. (*People v. Cox* (1991) 53 Cal.3d 618 [280 Cal.Rptr. 692, 809 P.2d 351].)

## A. *Prosecution's Guilt Phase Case*

Sometime between 5:00 and 6:00 a.m. on August 31, 1984, DeLisa Brown[2] and Ida Moore were at Moore's home on Third Avenue in Los Angeles when defendant, a casual acquaintance of Moore's, arrived with Horace Burns. Defendant made a telephone call. Burns left, but returned 20 to 30 minutes later with another man, Tiequon Cox. Defendant asked Moore to drive him and the other two men to "some lady's house" to "pick up some money."

The group left in Moore's van, with Moore driving, Brown in the front passenger seat, and the three men in the back. Moore needed gasoline for the van and asked the men for money. They said they had none, so Moore used her own money to pay for $2 worth of gasoline. Defendant told Moore to drive to 59th Street. On the way, Brown heard one of the men say something about "killing everybody" in the house. On 59th Street, defendant kept checking a piece of paper with an address written on it.

Near the corner of 59th and Main Streets, defendant directed Moore to pull over but to keep the motor running. He told Burns to stay in the van with the two women. Defendant and Cox got out and walked toward a house on 59th Street. Cox was carrying a jacket with something wrapped up inside. When Moore asked Burns what Cox and defendant were going to do, Burns replied that they were going to "shoot it up" to "scare people to make sure" they would hand over their money. Moments later, gunshots rang out.

Around 7:30 a.m. on August 31, 1984, 17-year-old LaShawn Driver was returning to her 59th Street home when she saw two men walking toward the Alexander house. Driver entered her own house. A couple of minutes later, she heard gunshots and ran outside. Within a minute or so, Driver saw defendant walking down the Alexanders' driveway. After a second volley of shots, Cox ran out of the Alexander house carrying a rifle.

Moore and Brown estimated that defendant was gone from the van for just a few minutes. When he returned, he was carrying a handgun. Defendant held the gun up, spun it around, blew on its barrel, and said he had only one bullet left. About three minutes later, Cox came back with a rifle. As he jumped in the van, he exclaimed, "I just blew a bitch's head off."

Defendant directed Moore to the corner of Gage and Vermont Avenues. Defendant told the two women not to say anything about what had just happened. Then, accompanied by his two male companions, defendant went into an establishment known as the Vermont Club. Moore and Brown returned to Moore's house.

---

[2]The transcript and briefs occasionally refer to DeLisa Brown as "Lisa" Brown.

A short while later, defendant telephoned Moore's house and asked that Brown drive defendant's car to the Vermont Club. On the way, Brown picked up Cox at a gas station and drove him to the back of the Vermont Club. Someone handed Cox the same rifle that Brown had seen him with on 59th Street, and Cox put it in the car trunk. Brown then drove Cox to 10th Avenue. Taking the rifle with him, Cox went into an apartment building; he returned five minutes later without the rifle.

Sometime between 10:00 and 10:30 a.m. on August 31, 1984, Brown and Moore met with defendant at the house of a mutual acquaintance. Defendant removed new clothes from a shopping bag, handed Moore $50 and asked her to buy him some toiletries. He also gave Moore $5 for the gasoline she had paid for earlier, and he gave Brown $20.

Later that same day, Cox bought a 1975 Cadillac for $3,000, paying for it in $100 and $20 bills. The next day, defendant made a $1,500 cash down payment on a used car for his wife.

When police entered the 59th Street home of Ebora Alexander, they found four people dead from gunshot wounds. Ebora Alexander died from multiple gunshot wounds to the head; apparently she was shot while sitting at the kitchen table having breakfast. The other three murder victims were shot in their beds, execution style: Dietria Alexander had three gunshot wounds to the head and neck, while the two young boys, Damani Garner and Damon Bonner, each died from a single gunshot wound to the head. Two persons who were present in the Alexander household during the shooting survived. One of them was Neal Alexander, a son of Ebora Alexander and a brother of Dietria Alexander. Awakened by screaming, Neal ran from his bedroom to Dietria's bedroom and saw an intruder holding a rifle. Neal then ran out of the house. The other survivor was 14-year-old Ivan Scott, a grandson of murder victim Ebora Alexander; he was asleep in his Uncle Neal's room when he was awakened by gunshots and screams. He immediately hid in a closet, and came out only after the gunfire had stopped.

Police ballistics experts identified bullet fragments and casings recovered from the Alexander home as having been fired by an M-1 carbine rifle. On September 27, 1984, police recovered an M-1 carbine from James Kennedy, who lived in an apartment on 10th Avenue. Kennedy said that Tiequon Cox had left the weapon at Kennedy's apartment early one morning. Although Kennedy could not recall the exact date, he did remember seeing a young woman sitting in a car in front of his building, waiting for Cox. Ballistics tests of the M-1 carbine retrieved from Kennedy and the bullet fragments and casings recovered at the murder scene established that some of the fragments and casings had come from the M-1 carbine. Others could have

been fired from the M-1 carbine, but were so damaged that ballistics experts could not say with certainty that they had come from that rifle, although nothing linked the fragments to any other weapon.

On February 28, 1985, two detectives from the Los Angeles Police Department arrested defendant in Richmond in Northern California for the murders of the four members of the Alexander family. Defendant waived his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], and agreed to talk to the officers. In this tape-recorded interview, which was played at trial, defendant gave several contradictory statements. He first said that he had heard about the murders and understood that the gunmen had gone to the wrong house. He denied any involvement. Later, defendant admitted he was present at the Alexander house, but insisted that he had run away as soon as Cox started shooting. Defendant said that he had heard that a man named "Jack" from the Vermont Club had hired Cox and Burns to kill a young woman who was suing the club for injuries sustained in a shooting.[3]

### B. *Defense Guilt Phase Case*

Defendant presented an alibi defense.

Mary Alford, defendant's cousin, testified that around 3:30 a.m. on August 31, 1984, defendant came to her house, and she allowed him to sleep on the couch. Between 6:30 and 8:30 a.m., Alford and two other people saw defendant asleep on the couch. Defendant was still at Alford's between 10:00 and 10:30 a.m. when another cousin, Willie Morris, talked to him.

At 6:00 p.m. that evening, defendant's wife, Cheryl Williams, picked him up at Alford's home. Defendant and his wife were separated but were trying to reconcile. They spent the next two nights in a motel in El Monte in Southern California. The next day, defendant made a cash down payment on a used car for Cheryl. Defendant had recently made $2,000 from a furniture sale, and still had most of $2,523 he had won a month earlier at the Hollywood Park racetrack.

Detective David Crews investigated the Vermont Club in connection with this case and heard that there had been a "contract" to kill a young woman named Valarie Taylor, who was injured in a shooting incident at the Vermont Club. Taylor had filed suit against several people she alleged were

---

[3]Defendant was tried separately from the other two participants. As stated earlier, we affirmed the death judgment of Tiequon Cox in *People* v. *Cox, supra*, 53 Cal.3d 618. In *People* v. *Burns* (1987) 196 Cal.App.3d 1440 [242 Cal.Rptr. 573], the Court of Appeal affirmed the judgment sentencing Horace Burns to life imprisonment without parole.

involved in the shooting and had also named as defendants the club and its owner, Ossie Jackson.

Private investigator Anthony Pellicano testified that he had examined the tape recording of the police interview with defendant and found pauses on the tape suggesting that the recorder might have been turned off during the interview.

## II. Pretrial Proceedings

### A. *Disqualification of Judge Dion Morrow*

Los Angeles Superior Court Judge Dion G. Morrow presided over the guilt phase of defendant's trial. The case was assigned to Judge Morrow on September 8, 1986. Judge Morrow immediately told the parties about a potential conflict: "[I]t is my understanding that my oldest daughter's husband's nephew was present at the time of the shooting. I don't know the child or anything about it, but my oldest daughter mentioned to me that her husband's nephew was present at the time of the shooting. Was there a child in the closet?" The prosecutor replied there had been and that the child's name was Ivan Scott. Judge Morrow then said: "My son-in-law's first name is Ivan, so is my grandson's, but it is my understanding the child was named Ivan after my son-in-law. As I said, I don't know the child, I have never met him or anybody in their family. I don't know them at all. And that is all I have to say about it."

The prosecutor waived any objection. When Judge Morrow asked what defendant wanted to do, the following colloquy ensued.

Mr. Jacke:[4] "Just talking to my client, your honor. There is no objection."

The court: "Is that correct, Mr. Williams?"

The defendant: "Yes, sir."

At the guilt phase of the trial, the prosecution called Ivan Scott as a witness. Ivan testified that Ebora Alexander was his grandmother; while sleeping at her home in his Uncle Neal's room on August 31, 1984, he was awakened by gunshots and screaming, after which he immediately ran and hid in a closet.

Defendant claims it was error for Judge Morrow to preside over the trial. According to defendant, Judge Morrow's family relationship to Ivan Scott

---

[4]Defendant was represented at trial by a father-and-son team, H. Clay Jacke and H. Clay Jacke II. The record does not reflect which of the two was speaking in this instance.

created a conflict of interest under Code of Civil Procedure section 170.1 and violated the due process principle that a defendant has a right to a fair trial before an impartial judge. We disagree.

As mentioned earlier, after hearing the judge's explanation of his son-in-law being the uncle of a prosecution witness, defendant personally and expressly agreed to have Judge Morrow hear his case. Thus, defendant may not now complain of error. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

Even if defendant had objected in the trial court, his statutory judicial disqualification claim is not properly before us on this automatic appeal following a judgment of death. (See *People v. Brown* (1993) 6 Cal.4th 322, 335 [24 Cal.Rptr.2d 710, 862 P.2d 710].) ■ Code of Civil Procedure section 170.3, subdivision (d) provides for review by writ of mandate sought within 10 days of the challenged decision as the exclusive means for challenging a ruling on the disqualification of a judge. (See *People v. Hull* (1991) 1 Cal.4th 266 [2 Cal.Rptr.2d 526, 820 P.2d 1036].) Defendant did not pursue this procedure in this case.[5]

■ Furthermore, the contention also fails on the merits. Code of Civil Procedure section 170.1, subdivision (a) specifies the grounds on which a judge "shall be disqualified." Among these is that "the judge has personal knowledge of disputed evidentiary facts concerning the proceeding." (Code Civ. Proc., § 170.1, subd. (a)(1).) For purposes of this statute, a judge is deemed to have personal knowledge if "the judge, or the spouse of the judge, or *a person within the third degree of relationship to either of them*, or the spouse of such a person *is to the judge's knowledge likely to be a material witness in the proceeding*." (*Ibid.*, italics added.) This is not the situation here.

Prosecution witness Ivan Scott does not qualify as "a person within the third degree of relationship" to Judge Morrow. In *Robinson v. Southern Pacific Co.* (1895) 105 Cal. 526, 557-558 [38 P. 722], this court explained when someone is within such a relationship. There, the plaintiff moved to disqualify an associate justice of this court, Justice W.C. Van Fleet, on the ground that a first cousin or "cousin-german" of the justice's wife was a stockholder of the defendant corporation. We denied the motion because the relationship between the justice and his wife's cousin was not one within the third degree. We explained: " 'In the collateral line the degrees are counted

---

[5]Defendant can raise on appeal, however, "nonstatutory claims that a final judgment is constitutionally invalid because of judicial bias." (*People v. Brown, supra*, 6 Cal.4th at p. 335, italics omitted.)

by generations from one of the relations up to a common ancestor, and from the common ancestor to the other relations. In such computation, the decedent is excluded, the relative included, and the ancestor counted but once. Thus, brothers are related in the second degree; *uncle and nephew in the third degree*; cousins-german in the fourth, and so on.' " (*Robinson, supra*, 105 Cal. at p. 557, italics added.)

Here, witness Ivan Scott is the nephew of Judge Morrow's son-in-law. Thus, as uncle and nephew, the relationship between the witness and the son-in-law is in the third degree. But the relationship between the witness and Judge Morrow is not within the third degree. Either the two are not related at all because there is no blood relationship between them (see Code Civ. Proc., § 170.5, subd. (d) ["The third degree of relationship shall be calculated according to our civil law system."]; 26A C.J.S., Descent & Distribution § 22, pp. 562-563 [civil law only recognizes relationships of consanguinity]), or their relationship is in the fifth degree (see former Code Civ. Proc., § 170.1 [recognizing relationships based on marriage but providing that spouses are separated by one degree]). Accordingly, the disqualification premise of Code of Civil Procedure section 170.1, subdivision (a)(1) does not apply here.

■ Moreover, this disqualifying provision is triggered only when a person with the requisite relationship to the judge is likely to be a "material witness" in the proceeding. (Code Civ. Proc., § 170.1.) A material witness is one "who can give testimony . . . no one else, or at least very few, can give." (Black's Law Dict. (6th ed. 1990) p. 977, col. 2.) Testimony is material only if it is "important," "more or less necessary," "going to the merits" (*id.* at p. 976, col. 2), or if it has some likelihood of affecting the outcome of the case (*People* v. *Pierce* (1967) 66 Cal.2d 53, 61 [56 Cal.Rptr. 817, 423 P.2d 969]). Here, Ivan Scott was not a material witness: His testimony that he ran and hid in the closet during the murders was not important or necessary to the merits of this case, and could not have affected the outcome.

We also conclude that Judge Morrow's presiding over defendant's guilt phase trial did not violate the due process guarantee of a fair trial before an impartial judge. Nothing in the record suggests such a violation.[6]

---

[6]Because we conclude that there was no statutory or constitutional impediment to Judge Morrow's presiding over defendant's trial, we do not address defendant's related contentions that his waiver of the purported disqualification of Judge Morrow was ineffective because it was not "signed by all parties and their attorneys and filed in the record" (Code Civ. Proc., § 170.3, subd. (b)(1)), and that his agreement for Judge Morrow to hear the case was not knowing and intelligent.

## B. *Motion for Change of Venue*

On January 31, 1986, defendant moved for a change of venue, asserting that extensive pretrial publicity before and during the separate trials of Tiequon Cox and Horace Burns threatened to deprive him of his constitutional right to a fair and impartial trial. Defense counsel's supporting declaration stated that the press had referred to the killings as "brutal, bizarre, and senseless," and had reported that the victims were related to a well-known football player, Kermit Alexander. Attached to the declaration were four articles from newspapers in the Los Angeles area: three about Tiequon Cox's convictions for the four murders with a special circumstance finding, and the fourth reporting on Horace Burns's sentence to life imprisonment without parole.[7]

The trial court did not hear the motion for change of venue until September 15, 1986, just before jury selection. At the hearing, defense counsel acknowledged that media coverage of the case had subsided. In denying the motion, the court observed that the case involved multiple homicides of family members "of somebody whose name was known," but that those facts alone were insufficient to justify moving the trial out of Los Angeles County. The court said its ruling was subject to a motion for reconsideration if during voir dire it appeared that pretrial publicity had affected the jury. Defendant never renewed his change of venue motion.

Defendant now claims that the trial court's ruling was wrong and that the jury deciding his guilt was tainted by pretrial publicity. Defendant has not preserved this issue. ■ As we explained in *People* v. *Howard* (1992) 1 Cal.4th 1132, 1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315], when a trial court initially denies a change of venue motion without prejudice, a defendant

---

[7]An article, *Penalty Phase to Come*, from the front page of the January 23, 1986, Los Angeles Sentinel reporting on the jury's guilt phase verdicts in the Cox case described Cox as "a South Central Los Angeles gang member," (*Penalty Phase to Come*, L.A. Sentinel (Jan. 23, 1986) p. A1, col. 1) as did a similar January 22, 1986, article *Triggerman Convicted in 4 Alexander Gun Deaths*, in the metro section of the Los Angeles Times. (Arnold, *Triggerman Convicted in 4 Alexander Gun Deaths*, L.A. Times (Jan. 22, 1986) p. 1M, col. 1.) Both articles said that the prosecution was seeking the death penalty for Cox. An article, *Triggerman convicted in Alexander slayings*, on page 3 of the January 22, 1986, edition of the Los Angeles Herald Examiner described Cox as "the second of three defendants to be found guilty of the early morning August 1984 killings believed to have occurred when the trio of Rolling 60s gang members entered an unlocked door at the wrong house." (Hill-Holtzman, *Triggerman convicted in Alexander slayings*, L.A. Herald Examiner (Jan. 22, 1986) p. A3, col. 1.) The Herald Examiner article mentioned defendant by name, noting that he was awaiting trial. The fourth newspaper article attached to the change of venue motion bears no date or masthead. It reported that Burns was sentenced to life imprisonment without possibility of parole, that an October 7 trial date had been set for codefendant Cox, and that "trial of the third defendant, Darren Charles Williams, 24, is expected to begin early next year."

must renew the motion after voir dire of the jury to preserve the issue for appeal. Here, although expressly invited by the court to renew the motion after jury selection, defendant failed to do so.

■ The contention also lacks merit. ■ A trial court must grant a defendant's motion for a change of venue "to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033.) Among the relevant factors are the nature and gravity of the offense, the size of the community, the prominence of the victims, and the nature and extent of publicity about the case. (*People* v. *Sanders* (1995) 11 Cal.4th 475, 505 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People* v. *Proctor* (1992) 4 Cal.4th 499, 523 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) A change of venue is warranted if there is a reasonable likelihood that the pretrial publicity has so tainted the jurors chosen for defendant's trial that they cannot impartially decide the case. (*People* v. *Sanders, supra,* 11 Cal.4th at p. 505; *People* v. *Bonin* (1988) 46 Cal.3d 659, 672-673 [250 Cal.Rptr. 687, 758 P.2d 1217].)

■ Here, the nature and gravity of the charged offense—capital murder involving the killing of four people, two of them children—was a factor weighing in favor of a change of venue, but it was not dispositive. (See *People* v. *Howard, supra,* 1 Cal.4th 1132, 1167; *People* v. *Cooper* (1991) 53 Cal.3d 771, 806 [281 Cal.Rptr. 90, 809 P.2d 865].) The size of the community (Los Angeles County, the largest and most populous in California) was a factor weighing heavily against a change of venue. (See *People* v. *Sanders, supra,* 11 Cal.4th 475, 506, citing *People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn. of Clark, J.) [" 'adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area' "].) As to the factor of victim prominence, the victims were not prominent; whatever prominence they had attained was after death and derived, as the trial court said, from their relationship to "somebody whose name was known." With regard to pretrial publicity, the case attracted considerable publicity right after the crimes. But two years later, when defendant went to trial, there was little if any publicity. In short, consideration of all of the relevant factors supports the trial court's denial of defendant's motion for a change of venue.

We also conclude from our independent evaluation of the record that pretrial publicity had no prejudicial effect on the jurors who actually heard defendant's case. Jury members need not be totally ignorant of the facts, so long as they "can lay aside their impressions and opinions and render a verdict based on the evidence presented in court." (*People* v. *Fauber* (1992) 2 Cal.4th 792, 819 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Here, the jurors were

either unaware of the pretrial publicity or had only vague recollections of reading or hearing something about the incident when it took place, and all agreed to base their decision solely on the evidence presented at trial.

### C. *Motion to Suppress Defendant's Tape-recorded Admissions*

On February 28, 1985, homicide detectives David Crews and Fred Miller of the Los Angeles Police Department went to Richmond in Northern California with a warrant for defendant's arrest. They sought out defendant's father, Charles Williams, told him of the warrant, and arranged for defendant to turn himself in at the Richmond police station.

After defendant's arrest, Detective Crews advised him of his constitutional rights under *Miranda* v. *Arizona, supra*, 384 U.S. 436; defendant waived his rights and agreed to talk with the officers about the murders of the four members of the Alexander family. The officers recorded the interview, which lasted less than an hour.

Defendant at first denied any involvement, claiming he had been in jail on the day of the killings. He stuck to that story even after the officers told him that Cox and Burns had implicated him.[8] Somewhat later, defendant said he had been with Cox and Burns in the van just before the killings but that he had run away before Cox approached the Alexander house. Eventually, defendant admitted he had "walked in the house, but then turned around and ran out" after Cox started shooting. Defendant mentioned that he was at Moore's house before the killings, and that she later gave him a ride to the Vermont Club. Throughout the interview, defendant denied any wrongdoing. He said that he had heard that a man named "Jack" from the Vermont Club had paid Cox and Burns something like $60,000 to kill a woman who was suing the club, but that he received none of the money because he had run away.

Before trial, defendant moved to suppress the tape-recorded interview, claiming his admissions were involuntary and obtained in violation of his right to counsel. Defendant's father, Charles Williams, testified in support of the motion. He recounted a conversation with one of the Los Angeles detectives at the Richmond police station immediately after defendant's arrest. He said he had told the officer that he was going to hire a lawyer to represent his son. Williams then returned to his office and tried to reach his own lawyer, but was unsuccessful. Later, someone called him from the Richmond police station and told him that defendant had "confessed."

Private investigator Anthony Pellicano also testified for the defense. Pellicano had examined a microcassette tape recording of defendant's statements to the police and found two pauses on the tape. He could express no

---

[8] In the taped interview, Cox is called "Fee," and Burns is called "Horse."

opinion on whether the tape recording had been edited, however, because he had not examined the recorder used to make the tape.

Also called by the defense was Detective Crews, who acknowledged that he had spoken with defendant's father before and just after defendant's arrest. Crews did not recall any statement by the father about hiring a lawyer for defendant.

After listening to the tape-recorded interview, the trial court denied defendant's motion to suppress the tape. Thereafter, the prosecution introduced the tape recording into evidence at trial and played it for the jury.

Defendant now raises several contentions regarding the taped interview. None has merit, as discussed below.

### 1. *Right to Counsel*

Defendant contends that he was denied the right to counsel, which is guaranteed by the Fifth and Sixth Amendments to the federal Constitution and is made applicable to the states through the Fourteenth Amendment, when the Los Angeles detectives told him at the Richmond police station that he could not see a lawyer until he was returned to Los Angeles. After Detective Crews told defendant that he was facing capital murder charges, the following colloquy ensued:

Crews: "Okay? I know you didn't pull the trigger. I know Fee [Cox] pulled the trigger. I want to know who set you guys up, who you were supposed to hit, because I know you hit the wrong house, and why. And I can tell you—now wait a minute, wait a minute."

Defendant: "Wait. I want—I want to talk to you."

Crews: "Wait, wait. Do you want to talk to me? You know, I can't talk—I can't let you talk unless you want to waive your rights, you know. Do you want an attorney before you talk to me? Do you want an attorney present before you talk to me?"

Defendant: "Well, that will mean I have to wait until I get to LA?"

Crews: "Right."

Another officer: "Yeah."

Defendant: "I don't mind talking."

Crews: "Okay. So you don't—."

Another officer: "You don't mind—you don't mind talking to us now?"

Defendant: "No (garbled)."

Crews: "Okay."

Another officer: "You don't want an attorney now when you talk to us?"

Defendant: "No, I don't."

After listening to this taped conversation, the trial court concluded that when defendant asked "Well, that will mean I have to wait until I get to LA?" and the detectives responded, "Right" and "Yeah," all three were referring to *where* the police would conduct their questioning of defendant, whether in Richmond or Los Angeles. The trial court's interpretation was a reasonable one. Therefore, we do not accept defendant's contrary assertion that the Los Angeles detectives told him that he would have to wait until he was in Los Angeles to talk to a lawyer.

We also reject defendant's contention that he was denied his right to counsel when Detective Crews told him he had just "one shot" to talk to the officers before arraignment on four counts of special circumstance murder. A criminal defendant has "a right to the presence of an attorney, either retained or appointed" before or during custodial interrogation by the police. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [86 S.Ct. 1602, 1612].) That right was not implicated by Detective Crews's statement that defendant had "one shot" to talk to the officers.

2. *Involuntary Admissions*

■ Defendant contends that introduction of his tape-recorded admissions to the two Los Angeles detectives at the Richmond police station violated the due process requirements of the Fifth and Fourteenth Amendments to the federal Constitution because those admissions were induced by promises of leniency and therefore were involuntary. We disagree.

In the recorded interview, defendant initially denied being present at the murder scene, claiming he had been in jail at the time. He maintained he "wasn't there" even after the detectives told him that his arrest and conviction records showed he was not in jail on the day of the killings, and that eyewitnesses had placed him at the scene.

Detective Crews then made this statement: "Well, you keep telling me, you know, that's fine (unintelligible), but think—stop and think a minute, CW [defendant's street name]. [¶] You keep saying I—no, I wasn't there and what you're doing is you're—you're stopping yourself from getting any possibility of a—a—chance to a deal. [¶] Okay? [¶] What I'm saying is, we can talk to the DA and you assist us in this investigation, you won't get the death penalty. [¶] He can go in and say, we retract the special circumstances on the—CW and—because of his cooperation (unintelligible), okay. [¶] Now I can't tell you beyond that whether you're going to get six months, ten years or five thousand years because I'd be silly to do that because that's up to the judge. Right? The judge is the one who sentences people. [¶] So when the DA—what we tell the DA and the DA, he tells the judge in his instructions, you know, hey, this guy's cooperative (unintelligible) restrict the—retract the death penalty portion of CW's prosecution. Now, what the judge decides to do, that's not up to the DA, that's not up to me, it's not up to my partner, or anybody else. The more you cooperate, the better it looks in his eyes when it comes time for sentencing. [¶] And you know that. You've been around the court."

Defendant insisted he had "nothing to do with it." A few minutes later, Detective Crews asked whether defendant had received any of the "contract" money paid to Burns and Cox. Defendant denied that he had, adding "because I ran out on them." It was only after this apparent slipup that defendant admitted being present at the murder scene.

The trial court, after observing defendant's demeanor in court and listening to the taped interview, ruled defendant's admissions were voluntarily made. The court described defendant as a "street kid, street man," in his "early 20's, big, strong, bright, not intimidated by anybody, in robust good health," and displaying "no emotionalism . . . [or signs of] mental weakness" in the course of the interview. We uphold the trial court's ruling.

█ A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. (*Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [ 92 S.Ct. 619, 626-627, 30 L.Ed.2d 618]; *People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity. (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 167 [107 S.Ct. 515, 521-522, 93 L.Ed.2d 473]; *People* v. *Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness. (*People* v. *Benson, supra,* at p. 779.)

But any factual findings by the trial court as to the circumstances surrounding an admission or confession, including " 'the characteristics of the accused and the details of the interrogation' (*Schneckloth* v. *Bustamonte* [(1973)] 412 U.S. [218], 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041])," are subject to review under the deferential substantial evidence standard. (*People* v. *Benson, supra,* at p. 779.)

In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider "the totality of circumstances." (*Withrow* v. *Williams* (1993) 507 U.S. 680, 693-694 [113 S.Ct. 1745, 1754, 123 L.Ed.2d 407]; *People* v. *Bradford* (1997) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *People* v. *Benson, supra,* 52 Cal.3d at p. 779.) Relevant are "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." (*Withrow* v. *Williams, supra,* 507 U.S. at pp. 693-694 [113 S.Ct. at p. 1754].)

After considering the totality of the circumstances in this case, we conclude there was no due process violation in introducing at trial defendant's admissions to the Los Angeles detectives that he was present during the killings at the Alexander house. The admissions occurred at the police station, in Richmond, where defendant's father was a prominent businessman; the questioning took place shortly after defendant's arrest and lasted less than an hour. During the greater part of the interrogation, defendant maintained his innocence. Even when he later admitted his presence at the scene of the murders, he insisted that he had played no role in the killings. The record belies defendant's claims that his admissions were the product of police coercion.

 Pointing to the comments of Detective Crews that we quoted earlier, defendant contends that his admissions must be deemed "involuntary" because they were induced by express or implied promises of leniency. We reject this contention.

In *People* v. *Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25], this court said that "where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law." Similarly, the United States Supreme Court stated in *Bram* v. *United States* (1897) 168 U.S. 532, 542-543 [18 S.Ct. 183, 186-187, 42 L.Ed. 568], that a confession is not voluntary if obtained by " 'any direct or implied promises, however slight, [or] by the exertion of

any improper influence.'" But in *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 285 [111 S.Ct. 1246, 1251, 113 L.Ed.2d 302], the high court described *Bram* as inconsistent with current precedent, and explained it does not reflect "the standard for determining the voluntariness of a confession." We echoed that view in *People* v. *Cahill* (1993) 5 Cal.4th 478, 513, footnote 2 [20 Cal.Rptr.2d 582, 853 P.2d 1037]. Thus, under current law, no single factor is dispositive in determining voluntariness, but rather courts consider the totality of circumstances. (*Withrow* v. *Williams*, *supra*, 507 U.S. at pp. 693-694 [113 S.Ct. at p. 1754]; *Arizona* v. *Fulminante*, *supra*, at pp. 285-286 [111 S.Ct. at pp. 1251-1252].)

Here, Detective Crews did promise defendant leniency when he suggested, somewhat equivocally, that if defendant cooperated in the investigation the district attorney might not seek the death penalty. But these comments by Detective Crews did not render defendant's admissions involuntary, because those comments were not the motivating cause of defendant's admissions.

For this same reason we reject defendant's related contention that the prosecution should have been "estopped" from pursuing the death penalty in light of Detective Crews's indication to defendant that the prosecution might not seek the death penalty if defendant cooperated in the investigation. Furthermore, because defendant did not raise this issue in the trial court, he has not preserved it for appeal. (*People* v. *Saunders*, *supra*, 5 Cal.4th at pp. 589-590.)

### 3. *Voluntariness of Miranda Waiver*

Similarly, the lack of factual support in the record and defendant's failure to object in the trial court lead us to reject his contention that the two Los Angeles detectives improperly "softened [him] up" before he agreed to talk to them without a lawyer being present. (See *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 160 [141 Cal.Rptr. 698, 570 P.2d 1050].)

### 4. *Authenticity of the Tape Recording*

Defendant's contentions that the tape recording played for the jury was not authenticated (see Evid. Code, § 1401) and that the police failed to preserve the recorder used to make the original microcassette tape of defendant's interview (see *California* v. *Trombetta* (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 2533-2534, 81 L.Ed.2d 413]) are issues not properly before us because defendant did not object to the admission of the tape-recorded statement on either ground. (*People* v. *Sims* (1993) 5 Cal.4th 405, 448 [20

Cal.Rptr.2d 537, 853 P.2d 992] [failure to object to introduction of transcript of tape-recorded interview for lack of authentication waives issue on appeal]; *People* v. *Clark* (1992) 3 Cal.4th 41, 125-126 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

In any event, both claims lack merit. The prosecution laid the foundation for admission of the tape recording when Detective Crews testified that the tape was a record of his conversation with defendant. (See Evid. Code, §§ 250 [defining "writing" to include recording], 1401 [requiring authentication of writings]; *People* v. *Mayfield* (1997) 14 Cal.4th 668, 747 [60 Cal.Rptr.2d 1, 928 P.2d 485] [a recording is authenticated by evidence that " 'it accurately depicts what it purports to show' "]; *People* v. *Bowley* (1963) 59 Cal.2d 855, 859 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.3d 1178] [same].)

■ Moreover, the prosecution's duty to preserve evidence arises only with regard to evidence "that might be expected to play a significant role in the suspect's defense." (*California* v. *Trombetta, supra,* 467 U.S. 479, 488 [104 S.Ct. 2528, 2534].) "To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at p. 489 [104 S.Ct. at p. 2534].) Nothing in the record suggests that the missing tape recorder possessed any exculpatory value to defendant.

## III. JURY SELECTION

### A. *Discriminatory Exercise of Peremptory Challenges*

During jury selection, the defense moved for a mistrial on the ground that the prosecutor had exercised six of his first eight peremptory challenges to excuse African-American prospective jurors.[9] The prosecutor immediately gave reasons for the six peremptory challenges. The trial court ruled that the defense had made a prima facie showing of purposeful discrimination. The court observed, however, that although the prosecutor had excused all of the African-Americans on the initial jury panel, the defense had also excused one African-American and, at the time of the motion, three of the twelve people seated in the jury box were African-American and three were Asian.

---

[9]As we said in *People* v. *Mayfield, supra,* 14 Cal.4th 668, 722, footnote 7, until a jury has been sworn, it is doubtful that a motion for mistrial is the correct procedural vehicle for raising a claim of discriminatory exercise of peremptory challenges. Rather, the issue should be raised by a motion to quash or dismiss the jury venire. (*Ibid.*)

Thereafter, the trial court accepted the prosecutor's stated reasons for excusing each of the six African-Americans, and denied the motion. Defendant contends this ruling was reversible error. We disagree.

 The exercise of peremptory challenges to eliminate prospective jurors because of their race violates the federal Constitution (*Batson* v. *Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 1719, 90 L.Ed.2d 69]) and the California Constitution (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]). "Although a defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race,' *Strauder* [v. *West Virginia* (1880)] 100 U.S. [303,] 305, he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." (*Powers* v. *Ohio* (1991) 499 U.S. 400, 404 [111 S.Ct. 1364, 1367, 113 L.Ed.2d 411].)

Peremptory challenges "traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury" (*Batson* v. *Kentucky*, *supra*, 476 U.S. at p. 91 [106 S.Ct. at p. 1720]) to be asserted by either the defense or prosecutor " 'on his [or her] own dislike, without showing any cause' . . . without reason or for no reason, arbitrarily and capriciously" (*Pointer* v. *United States* (1894) 151 U.S. 396, 408 [14 S.Ct. 410, 414, 38 L.Ed. 208,], quoting 1 Coke, Institutes 156b (19th ed. 1832)). Courts have generally tried to accommodate these two competing interests: "[the] historical privilege of peremptory challenge free of judicial control [citation] and the constitutional prohibition on exclusion of persons from jury service on account of race." (*Batson* v. *Kentucky*, *supra*, at p. 91 [106 S.Ct. at p. 1720].) A prosecutor crosses the line between what is constitutionally permissible and impermissible in exercising peremptory challenges by using those challenges "to exclude blacks [or others] from the jury 'for reasons wholly unrelated to the outcome of the particular case on trial' or to deny blacks [or others] 'the same right and opportunity to participate in the administration of justice enjoyed by the white population.' " (*Ibid.*, quoting *Swain* v. *Alabama* (1965) 380 U.S. 202, 224 [85 S.Ct. 824, 838, 13 L.Ed.2d 759].)

 A defendant who claims that the peremptory challenge system is " 'being perverted' " for such impermissible reasons has the initial burden of establishing a prima facie case of purposeful discrimination. (*Batson* v. *Kentucky*, *supra*, 476 U.S. at p. 91 [106 S.Ct. at p. 1720]; accord, *People* v. *Mayfield*, *supra*, 14 Cal.4th 668, 723; *People* v. *Arias* (1996) 13 Cal.4th 92, 134-135 [51 Cal.Rptr.2d 770, 913 P.2d 980].) To do so, the defendant "must make as complete a record as the circumstances permit, must establish that the challenged prospective jurors are members of a cognizable group, and must show a 'strong likelihood' that they were challenged because of their

group association." (*People* v. *Mayfield, supra,* at p. 723; *People* v. *Howard, supra,* 1 Cal.4th 1132, 1154; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 280.) Only then does the burden shift to the prosecution "to explain adequately the racial exclusion." (*Batson* v. *Kentucky, supra,* at p. 94 [106 S.Ct. at p. 1721]; *People* v. *Turner* (1994) 8 Cal.4th 137, 164 [32 Cal.Rptr.2d 762, 878 P.2d 521]; *People* v. *Wheeler, supra,* at p. 281.) But "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." (*Batson* v. *Kentucky, supra,* at p. 97 [106 S.Ct. at p. 1723].) Rather, adequate justification by the prosecutor may be no more than a "hunch" about the prospective juror (*People* v. *Turner, supra,* at p. 165), so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as "a mask for race prejudice" (*Powers* v. *Ohio, supra,* 499 U.S. 400, 416 [111 S.Ct. 1364, 1374]). Therefore, we do not engage in a comparative analysis of various juror responses to evaluate the good faith of the prosecutor's stated reasons for excusing a particular juror, "because comparative analysis of jurors unrealistically ignores 'the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar.' " (*People* v. *Fuentes* (1991) 54 Cal.3d 707, 714-715 [286 Cal.Rptr. 792, 818 P.2d 75], quoting *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1219-1220 [255 Cal.Rptr. 569, 767 P.2d 1047].)

 Here, the prosecutor provided reasons for his peremptory challenges of the six prospective jurors, all African-Americans, and in each instance the trial court agreed that a reason other than race justified the challenge, as discussed below.

### 1. *James Tarrant*

The prosecutor explained that he exercised a peremptory challenge against James Tarrant based on statements Tarrant made during voir dire that raised questions about his credibility. Tarrant asked to be excused from jury service for "kidney problems" and, when asked if he had ever been a witness in a court proceeding, gave a rambling account of an incident involving a liquor store owner who had been beaten up by store patrons. The trial court agreed that the prosecutor had ample reason for excusing Tarrant, who had impressed the court as someone who was not "emotionally of a mind to well and truly try a capital case."

### 2. *Harry Williams*

The prosecutor exercised a peremptory challenge of Harry Williams because Williams had three sons who were close to defendant's age and each

son had a criminal record. The trial court accepted this explanation, adding that one of Williams's sons was currently incarcerated in the federal penitentiary in Colorado, and that all three had drug problems.

### 3. *Mary Crute*

The prosecutor excused Mary Crute because she was acquainted with one of the defense attorneys and had worked with the attorney's wife on volunteer committees. The trial court found this explanation adequate and unobjectionable.

### 4. *Flora Cross*

The prosecutor explained that he had excused Flora Cross because she had children close in age to defendant and because of her views on the death penalty. The trial court accepted these reasons, noting that Cross had equivocated on whether she could ever vote for the death penalty.

### 5. *Robert McGlothin*

The prosecutor exercised a peremptory challenge of Robert McGlothin because of the latter's views on the death penalty. When questioned about those views, McGlothin first said: "Well, I have never had to confront such a question, but I doubt that I could institute such a penalty against someone even if they were guilty of such a crime, even if I found them guilty of such a crime. I don't feel that it's my power, anyone's power as a human being to order the life taken of another." When the prosecutor pressed McGlothin on whether he could ever vote for the death penalty, McGlothin replied, "I haven't said no," adding "No, I am not saying I absolutely can't." Based on these remarks by McGlothin, the trial court ruled that "it's rather clear that his responses to questions on the death penalty are such that a peremptory challenge is justified and not racially based."

### 6. *Jacquelin Goodwin*

Similarly, the prosecutor's peremptory challenge of Jacquelin Goodwin was based on her responses to questions about the death penalty. When asked whether she would *automatically vote for the death penalty*, Goodwin said, "Yeah, I think so." She also answered "yes," however, to the question whether she was *philosophically opposed to the death penalty*, adding, "It's my own personal opinion." When asked whether she *could ever return a death verdict*, Goodwin said, "Yes, I think so." The trial court characterized these responses by Goodwin as "equivocal" and "somewhat inconsistent,"

but considered them to be "very thin" justification for excusing Goodwin. The court concluded, however, that the prosecutor's exercise of a peremptory challenge was probably within "the area of discretion." We uphold that finding.

We accord great deference to a trial court's determination of the sufficiency of a prosecutor's explanations for exercising peremptory challenges. (*People* v. *Fuentes, supra,* 54 Cal.3d 707, 715.) Because those findings will largely "turn on evaluation of credibility" (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [106 S.Ct. at p. 1724]), we generally "rely on the good judgment of the trial courts to distinguish bona fide reasons . . . from sham excuses belatedly contrived to avoid admitting acts of group discrimination" (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 282). Here, "the trial court found at least one legitimate race-neutral explanation for each questioned peremptory challenge." (*People* v. *Pride* (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643]; see *People* v. *Wheeler, supra,* at p. 277, fn. 18.) Substantial evidence supports the trial court's finding. (*People* v. *Mayfield, supra,* 14 Cal.4th 668, 727.)

## B. *Denial of Defendant's For-cause Challenges of Prospective Jurors*

During the sequestered portion of the jury voir dire, defendant challenged six prospective jurors (Melva Gonzales, Winifred Wygant, Delores Winton, James Lewis, Olivia Wise, and James Price) for bias in favor of the death penalty. The trial court overruled the challenges. Defendant now argues these rulings were reversible error under the federal and state Constitutions. (U.S. Const., 5th, 6th, 8th, and 14th Amends.; Cal. Const., art. I, §§ 1, 7, 14, 15, 16, and 17.) Not so.

The United States Supreme Court has held that the federal Constitution's Sixth Amendment right to jury trial does not compel the states to provide a jury determination of penalty in a capital case. (*Morgan* v. *Illinois* (1992) 504 U.S. 719, 726 [112 S.Ct. 2222, 2228, 119 L.Ed.2d 492].) But when a state does provide for jury sentencing, as California does in capital cases, the due process clause of the Fourteenth Amendment of the federal Constitution requires the sentencing jury to be impartial to the same extent that the Sixth Amendment requires jury impartiality at the guilt phase of the trial. (*Morgan* v. *Illinois, supra,* at pp. 726-728, and 740 [112 S.Ct. at pp. 2228-2229 and 2235] (dis. opn. of Scalia, J.) [clarifying the constitutional underpinnings of the holding].) Our state Constitution provides the same guarantee. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1210-1211 [14

Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1248, fn. 4 [270 Cal.Rptr. 451, 792 P.2d 251].)

 When a prospective juror's views about the death penalty "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]), the juror is not impartial and may be challenged "for cause." (*People* v. *Danielson* (1992) 3 Cal.4th 691, 712 [13 Cal.Rptr.2d 1, 838 P.2d 729] [same test applies to prosecution challenges of jurors opposed to capital punishment as to defense challenges of jurors who favor capital punishment]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 764-765 [251 Cal.Rptr. 83, 759 P.2d 1260] [same].) If such a juror actually sits on a jury that imposes a death sentence, and the right to challenge the trial court's failure to remove the juror has been properly preserved for appellate review, the death sentence must be overturned. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 85 [108 S.Ct. 2273, 2276, 101 L.Ed.2d 80]; *People* v. *Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950].)

 To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so. (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Clark*, *supra*, 3 Cal.4th 41, 155.) Here, defendant used peremptory challenges to excuse prospective jurors Gonzales, Winton, Lewis, and Wise, but accepted a jury that included James Price even though defendant still had six peremptory challenges.[10] Thus, with regard to the trial court's ruling on defendant's "for cause" challenges to these five, defendant has not preserved his claim.[11]

But defendant has preserved his claim of trial court error in overruling his challenge to prospective juror Winifred Wygant. (See *Ross* v. *Oklahoma*, *supra*, 487 U.S. at pp. 85-86 [108 S.Ct. at p. 2277]; *People* v. *Mason*, *supra*, 52 Cal.3d at p. 954.) During selection of the alternate jurors, defendant exhausted all five of his peremptory challenges, one of which he used to excuse Wygant. When Carolyn Palmer was called to serve as an alternate juror, defendant had no remaining peremptory challenges, and the trial court denied his request for an additional peremptory challenge. Over defense objection, Palmer was sworn as an alternate juror. Later, she was chosen to

---

[10]Under former Penal Code section 1070, subdivision (a), each party in a capital case had 26 peremptory challenges. (Stats. 1978, ch. 98, § 2, p. 261.)

[11]James Price was one of the original 12 jurors sworn to hear defendant's case. When Price was hospitalized during trial, the court replaced him with an alternate juror, Shirley Dones, who participated in guilt phase deliberations in the case.

replace a juror excused for hardship, and she participated in the guilt phase deliberations.[12]

■ Defendant contends that the trial court erred in failing to excuse prospective juror Wygant "for cause," entitling him to a reversal because it forced him to expend on Wygant one of his peremptory challenges, leaving no remaining peremptory challenge to excuse Palmer. We reject this contention.

Wygant expressed no view about capital punishment that "would 'prevent or substantially impair the performance of [her] duties as a juror.'" (*Wainwright* v. *Witt, supra*, 469 U.S. at p. 424 [105 S.Ct. at p. 852].) When defense counsel asked Wygant whether she agreed with the adage "an eye for an eye, and a tooth for a tooth," she answered, "Sometimes." She also responded in the affirmative when questioned if capital punishment is ever appropriate, and if she would have the tendency to impose the death penalty as opposed to life imprisonment without possibility of parole on someone who had committed four murders. But she also stated that she did not favor the death penalty over life imprisonment without parole, and when asked whether a person who takes a human life ought to suffer death as the punishment, Wygant simply responded that it "depends on the circumstances."

C. *Questioning of Prospective Juror Roberta Martinez Regarding Her Religious Views*

During the sequestered portion of the voir dire proceedings, the trial court had the following exchange with prospective juror Roberta Martinez.

The court: "Do you have any conscientious or religious feelings about the death penalty law?"

Miss Martinez: "Yes."

The court: "Would you tell us what they are?"

---

[12]This case is distinguishable from *People* v. *Mickey* (1991) 54 Cal.3d 612, 682-683 [286 Cal.Rptr. 801, 818 P.2d 84], in which the defendant, during the selection of alternate jurors, used a peremptory challenge to excuse a prospective juror, Perez, whom the defendant had earlier sought to excuse "for cause" based on Perez's support for capital punishment, and thereafter, exhausted his peremptory challenges before the selection of alternate juror Quinn, who later replaced a juror excused for hardship. In *Mickey*, we concluded that the defendant had suffered no possible prejudice from having to use a peremptory challenge to excuse Perez because he never manifested any concern about the fairness or impartiality of Quinn, the juror who ultimately sat on the jury. (*Ibid.*) Here, by contrast, defendant did express concern about Juror Palmer's fairness and impartiality even though he did not seek to excuse her "for cause" during the sequestered portion of the voir dire.

Miss Martinez: "I am a Roman Catholic and I don't believe that I could vote to take someone's life."

The court: "Well, the Catholic Church has no position against a death penalty."

Miss Martinez: "I personally do."

The court: "You do. And this is a matter of your personal standards?"

Miss Martinez: "Uh-Huh."

The court: "Is that 'yes?' "

Miss Martinez: "Yes."

On the prosecutor's challenge for cause, the trial court excused Martinez.

Defendant now asserts that the trial court violated defendant's religious rights and those of prospective juror Martinez when it elicited Martinez's religious affiliation. In addition, defendant urges us to adopt a rule of reversible error based on *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521 [88 S.Ct. 1770, 1776, 20 L.Ed.2d 776], declaring that a prospective juror with religious objections to capital punishment cannot be excluded from service in a capital case absent a finding that the juror would automatically vote against the death penalty.

We reject these contentions at the threshold. Defendant raised no objection during the trial court's questioning of prospective juror Martinez and, thus, has not preserved these issues for review. (*People* v. *Medina* (1995) 11 Cal.4th 694, 740 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People* v. *Visciotti* (1992) 2 Cal.4th 1, 48 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

## IV. TRIAL

### A. *Leading Questions to Witnesses Brown and Moore*

At the guilt phase of trial, Ida Moore testified that at defendant's direction she had driven him and his two friends (Tiequon "Fee" Cox and Horace "Horse" Burns) to a location on 59th Street in Los Angeles, where defendant and Cox left Moore's van and walked up to a house on the street. The prosecutor, Sterling Norris, then asked Moore, "Did you ask, say anything to Mr. Burns, Horse, as he was sitting there as to what these other two were going to do?" Moore replied, "Yes." Defense Attorney Jacke interrupted

with a request for a bench conference. Thereafter, the prosecutor continued questioning Moore, as follows:

Mr. Norris: "Mrs. Moore, we were at the point of your asking Mr. Burns what the other two were going to do?"

Mrs. Moore: "Yes."

Mr. Norris: "Was there a reply by Mr. Burns?"

Mrs. Moore: "Yes."

Mr. Norris: "What did Mr. Burns say?"

Mrs. Moore: "They were going to shoot *it* up, they were going to scare the people to make sure they give them their money." (Italics added.)

Mr. Norris: "Was there anything said about shooting *them* up?" (Italics added.)

Mrs. Moore: "Yes."

Mr. Jacke: "*Move to strike that as leading.*" (Italics added.)

The court: "Overruled. She already said that, Mr. Norris (*sic*)."

(The judge then asked the witness:) "What did the man say to you in the van?"

Mrs. Moore: "He said they was going to go there to shoot *it* up, just scare them." (Italics added.)

The court: "Okay."

Later, the prosecutor questioned DeLisa Brown, as follows:

Mr. Norris: "Now going back a minute, Lisa, from the time that you got in the van at Ida Moore's house and the time you arrived where they said to stop down the street a ways. At that point, sometime between that period of time in the van, did you hear either CW, Fee, or Horace say something in the back of the van?"

Ms. Brown: "No, I don't remember that."

Mr. Norris: "Do you recall something being said about *killing somebody*?" (Italics added.)

Mr. Jacke: "*Objection to that as leading.*" (Italics added.)

The court: "Overruled. You may answer that yes or no."

Ms. Brown: "Yes, I think so."

Mr. Norris: "What did you hear said?"

Ms. Brown: "*To kill everybody in the house.*" (Italics added.)

Mr. Norris: "Did they say 'we' or 'I' or 'they' or what?"

Ms. Brown: "I don't remember."

Mr. Norris: "Something to the effect of killing everybody in the house?"

Ms. Brown: "Yes."

Mr. Norris: "Is that right?"

Ms. Brown: "Yes."

Mr. Norris: "And as you sit there now, do you know whether that was Fee, CW, or Horace that said that?"

Ms. Brown: "No, I don't."

Mr. Norris: "It was one of the three; is that right?"

Ms. Brown: "Yes."

The prosecutor relied on this testimony by witnesses Moore and Brown when he argued to the jury that defendant had the intent to kill everyone in the house.

 Defendant contends that the trial court committed reversible error in allowing the prosecutor to ask witness Moore, "Was there anything said about shooting *them* up?" (substituting the word "*them*" for the word "*it*" used by Moore), and to ask witness Brown, "Do you recall something being said about *killing somebody*?" (Italics added.) Defendant characterizes these two questions as impermissible "leading questions" that resulted in the admission of testimony essential to the prosecution's theory that defendant had acted with the intent to kill everyone in the Alexander house and that therefore were prejudicial. We reject this contention.

 Evidence Code section 767, subdivision (a)(1), provides that leading questions "may not be asked of a witness on direct or redirect examination" except in "special circumstances where the interests of justice otherwise require." Trial courts have broad discretion to decide when such special circumstances are present. (See *Estate of Siemers* (1927) 202 Cal. 424, 437 [261 P. 298]; *People* v. *Garbutt* (1925) 197 Cal. 200, 207 [239 P. 1080].)

A question is "leading" if it "suggests to the witness the answer the examining party requires." (Evid. Code, § 764; see also 3 Witkin, Cal. Evidence (3d ed. 1986) § 1820, p. 1779 et seq.; 1 McCormick on Evidence (4th ed. 1992) § 6, p. 17; 3 Wigmore, Evidence (Chadbourn ed. 1970) § 769, p. 154.)

One treatise on evidence offers this explanation on leading questions: "A question may be leading because of its form, but often the mere form of a question does not indicate whether it is leading. The question which contains a phrase like 'did he not?' is obviously and invariably leading, but almost any other type of question may be leading or not, dependent upon the content and context. . . . The whole issue is whether an ordinary man would get the impression that the questioner desired one answer rather than another. The form of a question, or previous questioning, may indicate the desire, but the most important circumstance for consideration is the extent of the particularity of the question itself." (1 McCormick on Evidence, *supra*, § 6, pp. 17-18.) Another treatise says that a question is leading if it " 'instructs the witness how to answer on material points, or puts into his mouth words to be echoed back, . . . or plainly suggests the answer which the party wishes to get from him.' " (3 Wigmore, Evidence, *supra*, § 769, p. 155, quoting *Page* v. *Parker* (1860) 40 N.H. 47, 63.) And in his treatise, Justice Bernard Jefferson states that "A question calling for a 'yes' or 'no' answer is a leading question only if, under the circumstances, it is obvious that the examiner is suggesting that the witness answer the question one way only, whether it be 'yes' or 'no.' " (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 27.8, p. 762.) Justice Jefferson adds this caution, however: "When the danger [of false suggestion] is present, leading questions should be prohibited; when it is absent, leading questions should be allowed." (*Ibid.*)

 Even if the prosecutor's question to DeLisa Brown—"Do you recall something being said about killing somebody?"—was "leading" because it suggested to the witness the answer that the prosecutor wanted, the question was properly allowed by the trial court. A leading question is permissible on direct examination when it serves "to stimulate or revive [the witness's] recollection." (3 Witkin, Cal. Evidence, *supra*, § 1822, p. 1782.) That was the situation here. The prosecutor asked Brown if she heard

defendant, Cox, or Burns "say something in the back of the van"; Brown replied that she did not remember. To refresh Brown's recollection, the prosecutor asked her, "Do you recall something being said about killing somebody?", to which Brown replied, "Yes, I think so." The prosecutor then inquired, "What did you hear?", and Brown answered, "To kill everybody in the house." This properly admitted testimony by Brown lent support to the prosecution's theory that defendant's intent was to kill everybody in the house.

We now turn to Ida Moore's affirmative response to the prosecutor's question, "Was there anything said about shooting *them* up?" (Italics added.) That testimony was merely cumulative of the properly admitted evidence that came in through DeLisa Brown's testimony that one of the men in the van had said something about "kill[ing] everybody in the house." Therefore, even assuming that, as defendant contends, the prosecutor's question of Moore was "impermissibly leading," it is not reasonably probable that the jury deciding guilt would have reached a different verdict on the four counts of first degree murder had the trial court stricken Moore's response to the question. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant accuses the prosecutor of misconduct in asking the questions of Brown and Moore just discussed. As we have explained, there was no impropriety in the prosecutor's question to DeLisa Brown. With regard to the question asked of Ida Moore, defendant failed to object to the prosecutor's question as misconduct and did not request a curative admonition from the trial court. Therefore, he has not preserved the claim. (*People* v. *Mayfield*, *supra*, 14 Cal.4th 668, 753; *People* v. *Cain* (1995) 10 Cal.4th 1, 48 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

### B. *Adequacy of Jury Instructions on the Natural and Probable Consequences Doctrine*

The trial court gave the jury CALJIC No. 3.00, an instruction that defined the "principals" liable for a crime as including not only "[t]hose who directly and actively commit the act constituting the crime," but also "[t]hose who aid and abet the commission of the crime." The instruction also stated: "One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the *natural and reasonable or probable consequences* of any act that he knowingly and intentionally aided or encouraged." (CALJIC No. 3.00 (1984 rev.), italics added.) Defendant argues that the trial court erred in not giving, on its own initiative, a clarifying instruction that the jury must specifically determine whether the charged crimes were the "natural and

probable consequences" of some other criminal act defendant knowingly and intentionally aided or encouraged. We disagree.

In *People* v. *Hammond* (1986) 181 Cal.App.3d 463, 469 [226 Cal.Rptr. 475], the Court of Appeal proposed that such a clarifying instruction be given in cases in which "a defendant is charged not only with the perpetrator's planned offense but with another offense ultimately committed as a natural and probable consequence thereof." (See also CALJIC No. 3.02 (1988 rev.) [adopting the *Hammond* proposal].) As defendant acknowledges, we held in *People* v. *Cox*, *supra*, 53 Cal.3d 618, 668-669 (the automatic appeal of coparticipant Tiequon Cox), that a trial court need not give the *Hammond* clarifying instruction absent a request. Defendant tries to distinguish this case from *Cox* on the ground that in *Cox* the prosecution's theory was that Cox was the triggerman, whereas here defendant aided and abetted Cox. Thus, defendant argues, the trial court had a sua sponte obligation to give the clarifying instruction. Not so.

The prosecution's theory that Cox was the triggerman did not provide the basis for our holding in *Cox*. ██ Rather, we assumed that the evidence justified an instruction on aider and abettor liability including the natural and probable consequences doctrine. (*People* v. *Cox*, *supra*, 53 Cal.3d at pp. 668-669.) We concluded, however, that when a court so instructs, it has no sua sponte obligation to give a clarifying instruction that the jury must specifically determine whether the charged crimes were the "natural and probable consequences" of some other criminal act that the defendant knowingly and intentionally aided and abetted. (*Ibid.*)

Our recent decision in *People* v. *Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013] compels no different result. There we held that "when the prosecution relies on the 'natural and probable consequences' doctrine to hold a defendant liable as an aider and abettor, the trial court must, *on its own initiative*, identify and describe for the jury any target offense allegedly aided and abetted by the defendant." (*Id.* at p. 268, original italics.) Assuming for the sake of argument that in this case, which was tried 10 years before our decision in *Prettyman*, the trial court should have identified and described a target offense for the jury, any error in failing to do so was harmless. Based on the evidence, there were only two possible target crimes—assault with a deadly weapon (§ 245) and shooting at an inhabited dwelling (§ 246)—in light of Burns's statement to Moore that defendant and Cox had gone to the house on 59th Street to "shoot it up," just to scare people. But as we concluded in *People* v. *Cox*, *supra*, 53 Cal.3d 618, 669, "no reasonable jury would have concluded that the homicides were not a natural and probable consequence of such violence." Therefore, defendant

was not prejudiced by the absence of an instruction identifying and describing the target offenses pertinent to the natural and probable consequences doctrine.

### C. *Jury Instruction on Aiding and Abetting*

The jury instructions included a modified version of CALJIC No. 3.01 (1984 rev.), which defines aiding and abetting.[13] Defendant contends this instruction was ambiguous because it did not clarify that the intent of an aider and abettor must be formed before or during the actual offense and not after. We discern no such ambiguity.

We evaluate claims of instructional error " 'in the context of the overall charge' " to the jury. (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 824 [12 Cal.Rptr.2d 682, 838 P.2d 204], quoting *Cupp* v. *Naughten* (1973) 414 U.S. 141, 146-147 [94 S.Ct. 396, 400, 38 L.Ed.2d 368]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 215-216 [260 Cal.Rptr. 583, 776 P.2d 285].) Here, in addition to the instruction on aiding and abetting (advising the jury that a person aids and abets the commission of a crime if he or she "shares the intent of the perpetrator"), the trial court instructed the jury that in each of the charged crimes of murder "there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator and unless such specific intent exists the crime to which it relates is not committed." (CALJIC No. 3.31 (rev. 1980).) The court also instructed that the intent necessary for murder was "malice aforethought" (CALJIC No. 8.10 (rev. 1984)), that "aforethought" meant that "the required mental state must precede rather than follow the act" (CALJIC No. 8.11.2 (1983 rev.)), that all murder "perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder in the first degree" and that " 'premeditated' means considered beforehand" (CALJIC No. 8.20.1 (1979 rev.)). The instruction on first degree murder further provided: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder in the first degree." (*Ibid.*)

---

[13]The instruction read: "A person aids and abets the commission of a crime when he or she, [¶] (1) shares the intent of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, by act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be personally present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

Considered together, these instructions told the jury that an aider and abettor who shares the actual perpetrator's intent to kill must have formed that intent beforehand.

Defendant also contends that the trial court erred in not instructing the jury under *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] that an aider and abettor must have "knowledge of the unlawful purpose of the perpetrator." (*Id.* at pp. 560-561 ["[A]n appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."].) (*Id.* at p. 561.) Not so. To be sure, the trial court's instruction did not state that an aider and abettor must have "knowledge of the unlawful purpose of the perpetrator" as specified in *Beeman*. But the instruction advised the jury that an aider and abettor must "share[] the intent of the perpetrator." Implicit in the notion of someone "sharing" another's intent is knowledge of that intent and harboring the same purpose oneself. Accordingly, the trial court's instruction adequately advised the jury of the requirements for aider and abettor liability.[14]

### D. *Instructional Issues Regarding "Diminished Capacity"*

During guilt phase deliberations, the jury sent a note to the trial court asking for "the legal definition of diminished capacity." The court responded by instructing the jury in the language of section 28, subdivision (b): "As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility or irresistible impulse in a criminal action or juvenile adjudication hearing." Defense counsel reminded the court of DeLisa Brown's testimony that defendant was "probably spaced out" on the morning of the killings, and he argued that this justified an instruction on "voluntary intoxication." The trial court disagreed, saying: "The words 'spaced out,' whatever they mean, don't necessarily mean intoxicated. I know a whole lot of people referred to as space cadets, spaced out, based on their personal lack of ability to focus their thoughts and actions."

---

[14]The trial court's instruction on the "natural and probable consequences" doctrine as an alternative basis for aider and abettor liability advised the jury that defendant could be guilty of first degree murder without intent to kill each victim if the killings were the natural and probable consequence of conduct defendant did intend. We reject defendant's contention that the trial court had to instruct the jury on its own initiative that the death of an unintended victim must be "reasonably foreseeable." (See *People* v. *Roberts* (1992) 2 Cal.4th 271, 321-322 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

Defendant argues the court erred in responding to the jury's question and in refusing defendant's requested instruction. We reject both contentions for reasons given below.

■ According to defendant, the trial court misled the jury by instructing that there is no defense of "diminished capacity" without also explaining that a jury can consider evidence of a defendant's so-called "diminished actuality." As defendant points out, when our Legislature eliminated the defense of diminished capacity (Stats. 1981, ch. 404, pp. 1591-1592), it precluded jury consideration of mental disease, defect, or disorder as evidence of a defendant's *capacity* to form a requisite criminal intent, but it did not preclude jury consideration of mental condition in deciding whether a defendant *actually* formed the requisite criminal intent. (§ 28, subd. (a) [describing the prohibited and allowable uses of evidence of mental disease, mental defect, or mental disorder in a criminal case]; see also § 22, subd. (b) [explaining that evidence of voluntary intoxication as an excuse for a crime "is admissible solely on the issue whether or not the defendant actually formed a required specific intent"].) Here, however, *diminished actuality* was not in issue, and thus the trial court had no reason to instruct on that doctrine in responding to the jury's question seeking the legal definition of the term *"diminished capacity."* In phrasing its response to the jury in the language of section 28, subdivision (b), the trial court provided the jury with, in defendant's words, "a true statement of California law." No more was required.

■ Defendant also contends that the trial court erred in refusing his requested instruction on voluntary intoxication as a defense to a specific intent crime. Not so.

A defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent." (*People v. Horton* (1995) 11 Cal.4th 1068, 1119 [47 Cal.Rptr.2d 516, 906 P.2d 478]; see also *People v. Saille* (1991) 54 Cal.3d 1103, 1117 [2 Cal.Rptr.2d 364, 820 P.2d 588] [explaining that a defendant charged with murder is free to show that "because of his mental illness or voluntary intoxication, he did not *in fact* form the intent unlawfully to kill" (original italics)].) Here, defendant sought the instruction based solely on witness DeLisa Brown's testimony that defendant was "probably spaced out" on the morning of the killings. He now seeks to bolster that argument by pointing to comments he had made in the recorded interview with police that around the time of the killings he was "doped up" and "smokin' pretty tough then." Even if we consider all three of these statements, there was no error. Assuming this scant evidence of defendant's voluntary intoxication would qualify as "substantial," there was

no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent.

### E. Sufficiency of Evidence of Intent to Kill

Defendant raises two issues regarding the sufficiency of evidence of intent to kill. First, he argues there was insufficient evidence that he intended to kill more than one person.[15] Second, he claims the evidence was insufficient to show that he had formed an intent to kill the four victims at the Alexander house before or during the killings. Neither issue has merit.

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People* v. *Mayfield, supra,* 14 Cal.4th 668, 767, quoting *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319-320 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560].)

Defendant directed Moore to drive him, Burns, and Cox to 59th Street. Once there, defendant tried to locate the house he was looking for by matching its address with one written on a piece of paper he was holding. Defendant voiced no disagreement when someone in Moore's van mentioned killing everyone in the house. Defendant told Burns to stay in the van with the women while he and Cox, both armed, went to the house in question. After the killings of the four members of the Alexander family at their home, defendant went to the Vermont Club and, shortly thereafter, had a large sum of money. Defendant told police he had heard that the Vermont Club's owner had a "contract" out "to get rid of" a woman who was suing the club, and that the people who collected on that contract had gone to the wrong house.

From this evidence, a reasonable trier of fact could conclude that defendant had decided to collect on the contract to kill Valarie Taylor, and that on the way to her house he agreed with Cox and Burns that they would kill everyone in the house. The evidence was therefore sufficient that defendant

---

[15]We understand defendant to concede, at least for the sake of this argument, that the intent to kill Valarie Taylor could, under the doctrine of "transferred intent," provide the intent necessary for one count of first degree murder.

intended to kill more than one person and that he had formed that intent before going to the Alexander house where the four killings took place.[16]

F. *Accomplice Testimony by Prosecution Witnesses Moore and Brown*

1. *Trial Court's Refusal to Instruct That Moore and Brown Were Accomplices as a Matter of Law*

■ The trial court refused defendant's proposed instruction that witnesses Ida Moore and DeLisa Brown were accomplices as a matter of law, and instead instructed the jury that it must determine whether Moore and Brown were accomplices.[17] Defendant contends the court erred in refusing the proffered jury instruction.

Section 1111 provides, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. . . ." It defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." (§ 1111; see *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 759 [230 Cal.Rptr. 667, 726 P.2d 113].) Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury "unless the evidence permits only a single inference." (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1227 [283 Cal.Rptr. 144, 812 P.2d 163].) Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are "clear and undisputed." (*People* v. *Rodriguez, supra,* at p. 759; accord, *People* v. *Fauber, supra,* 2 Cal.4th 792, 834; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335].)

Here, the trial court correctly declined to instruct the jury that Moore and Brown were accomplices. There was evidence that both women provided

---

[16]Even in the absence of sufficient evidence of intent to kill, the guilty verdicts can be sustained on the alternative ground that the four murders were the natural and probable consequence of criminal acts (assault with a deadly weapon or shooting at an inhabited dwelling) that defendant knowingly aided and abetted. (See *People* v. *Prettyman, supra,* 14 Cal.4th 248.)

[17]Defendant's proposed instruction, CALJIC No. 3.16, would have advised the jury: "If the crime of _____ was committed by anyone, the witness[es] Ida Moore and DeLisa Brown were accomplices as a matter of law and their testimony is subject to the rule requiring corroboration." The trial court gave these instructions relevant to accomplice testimony: CALJIC No. 3.10 (1984 rev.), defining accomplice; a modified version of CALJIC No. 3.14 (1979 rev.), regarding the criminal intent necessary for an accomplice; CALJIC No. 3.19 (1979 rev.), defense burden to prove corroborating witness is an accomplice; CALJIC No. 3.18 (1979 rev.), testimony of accomplice to be viewed with distrust; CALJIC No. 3.11 (1979 rev.), testimony of accomplice must be corroborated; CALJIC No. 3.12 (1979 rev.), sufficiency of evidence to corroborate an accomplice; and CALJIC No. 3. 13 (1979 rev.), one accomplice may not corroborate another.

assistance to defendant and his two cohorts—Moore by driving the van to and from the scene of the murders, and Brown by helping Cox dispose of the murder weapon. But this evidence of Moore's and Brown's criminal culpability was not so clear and undisputed that a single inference could be drawn that either one would be liable for the *"identical offense[s]"* charged against defendant, namely, four counts of special circumstance murder. Accordingly, the trial court properly left it to the jury to decide whether either Moore or Brown was an accomplice.

### 2. *Use of Defendant's Admissions to Corroborate Accomplice Testimony*

Defendant faults the trial court for not instructing sua sponte that if the jury found that Moore or Brown were accomplices, it could not rely on defendant's admissions to the police to corroborate their testimony. Defendant is wrong. ■ The necessary corroborative evidence for accomplice testimony can be a defendant's own admissions. (See *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1208, fn. 9 [249 Cal.Rptr. 71, 756 P.2d 795] [defendant's testimony and inferences therefrom may be sufficient corroboration]; *People* v. *Rippberger* (1991) 231 Cal.App.3d 1667, 1684 [283 Cal.Rptr. 111] ["A defendant's own conduct, declarations and testimony may furnish adequate corroboration for the testimony of an accomplice."]; see also *People* v. *Zapien* (1993) 4 Cal.4th 929, 983 [17 Cal.Rptr.2d 122, 846 P.2d 704] [defendant's flight constitutes an implied admission that can properly be considered as corroborative of accomplice testimony]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 773 [254 Cal.Rptr. 257, 765 P.2d 419] [same].) We find no error here.

### 3. *Sufficiency of Corroborating Evidence*

■ We reject defendant's contention that there was insufficient corroboration of the testimony by Moore and Brown.[18]

" 'The evidence required for corroboration of an accomplice "need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to

---

[18]Of course, such corroboration is required only if the jury determined that Moore or Brown was an accomplice.

establish every element of the offense charged." [Citations.] Moreover, evidence of corroboration is sufficient if it connects defendant with the crime, although such evidence "is slight and entitled, when standing by itself, to but little consideration." [Citations.]' " (*People* v. *Garrison, supra,* 47 Cal.3d 746, 773, quoting *People* v. *Hathcock* (1973) 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476].)

Here, the testimony of witness LaShawn Driver (who identified defendant as the man she saw leaving the Alexander residence at the time of the shootings) and the tape recording of defendant's interview with the police (in which defendant admitted being present at the scene of the murders) sufficiently corroborated the testimony of Moore and Brown by connecting defendant to the shooting deaths of the four members of the Alexander family.

### G. Statements Attributable to Burns and Cox

#### 1. Admission of Out-of-court Statements

■ Defendant contends that the out-of-court statements testified to by witnesses Moore and Brown (that Horace Burns said defendant and Tiequon Cox went to the house to "shoot it up," and that one of these three men said something about killing everyone in the house) were inadmissible hearsay. (Evid. Code, § 1200.) Because defendant never objected to the admission of either statement as hearsay, he has not preserved the issue for appeal. (*People* v. *Clark, supra,* 3 Cal.4th at pp. 125-126.) In any event, both statements were admissible, under Evidence Code section 1223, as statements in furtherance of a conspiracy.[19] (See *People* v. *Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781].) The trial court could reasonably conclude that the comment about killing everyone reflected planning activity, and that Burns's statement that Cox and defendant were going to "shoot it up" was meant to reassure Moore and to dissuade her from driving away and abandoning Cox and defendant. Because we conclude that the statements were properly admitted, defendant is wrong that trial counsel was incompetent for not objecting to their admission. (See *Strickland* v. *Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

---

[19]Evidence Code section 1223 reads: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order or proof, subject to the admission of such evidence."

Also without merit is defendant's contention that admission of the statements under Evidence Code section 1223 violated his constitutional right to confront witnesses against him. (U.S. Const., 6th, 14th Amends.; Cal. Const., art. I, § 15.) Both the United States Supreme Court and this court have in the past rejected such an argument. (*Bourjaily* v. *United States* (1987) 483 U.S. 171, 183 [107 S.Ct. 2775, 2782-2783, 97 L.Ed.2d 144] [hearsay exception for coconspirator statements is firmly rooted and thus a court need not independently inquire into the reliability of such statements]; *United States* v. *Inadi* (1986) 475 U.S. 387, 396-397 [106 S.Ct. 1121, 1127, 89 L.Ed.2d 390]; *People* v. *Hardy, supra,* 2 Cal.4th 86, 150-151; *People* v. *Brawley* (1969) 1 Cal.3d 277, 286-291 [82 Cal.Rptr. 161, 461 P.2d 361].)

### 2. *Instructional Issues*

Defendant argues that the trial court should have instructed on its own initiative that Burns and Cox were accomplices as a matter of law and thus that any out-of-court statements attributed to them required corroboration.

Defendant is correct that both Burns and Cox meet section 1111's definition of an accomplice: Each was liable to prosecution (and indeed was prosecuted) for the identical offenses charged against defendant (four counts of murder with the special circumstance for multiple murder). But he is wrong that the trial court should have instructed that their out-of-court statements made in the van on the way to the crime scene and during the murders required corroboration. ■ A court must instruct on the need for corroboration only for accomplice *testimony* (§ 1111); " ' "testimony" within the meaning of . . . section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances.' " (*People* v. *Williams* (1997) 16 Cal.4th 153, 245 [66 Cal.Rptr.2d 123, 940 P.2d 710], quoting *People* v. *Jeffery* (1995) 37 Cal.App.4th 209, 218 [43 Cal.Rptr.2d 526]; see also *People* v. *Andrews, supra,* 49 Cal.3d 200, 215-216 [accomplice's tape-recorded statement to police required corroboration].) As we explained in *People* v. *Sully, supra,* 53 Cal.3d 1195, 1230: "The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed into evidence." (Italics added.) Here, statements made in the course of and in furtherance of the conspiracy were not made under suspect circumstances and therefore were sufficiently reliable to require no corroboration. For this reason too, defendant is wrong that the trial court should have modified the standard jury instruction on sufficiency of evidence necessary to corroborate the testimony of an accomplice

(CALJIC No. 3.12) to reflect that corroboration was required not only for accomplice testimony but also for accomplice statements.

Defendant faults the trial court for not instructing on its own initiative that coconspirator statements cannot be considered against another alleged conspirator absent a jury finding that there was a conspiracy and that the statements were made during and in furtherance of the conspiracy. Assuming that the court should have so instructed sua sponte (see *People* v. *Smith* (1986) 187 Cal.App.3d 666, 679-680 [231 Cal.Rptr. 897]), defendant could have suffered no possible prejudice. The evidence was overwhelming that Burns and Cox were coconspirators, and that the statements attributed to them and made in Moore's van were in furtherance of the conspiracy.

### 3. *Reliability of Capital Sentencing*

Defendant asserts that our law fails to meet due process and Eighth Amendment standards for reliability of capital sentencing by allowing a guilt phase jury to rely on a coconspirator's out-of-court statements unsupported by corroborating evidence to find that a defendant tried as an aider and abettor had the intent to kill the victims. We disagree. ■ The Eighth Amendment standards for reliability of capital sentencing pertain to provisions of a state's death penalty law (see *California* v. *Ramos* (1983) 463 U.S. 992, 998-999 [103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [96 S.Ct. 2978, 2991, 49 L.Ed.2d 944]), not to its procedural rules governing determinations of guilt.

### H. *Trial Court's Response to Jury Question About Intent to Kill*

■ Shortly after the jury began deliberating, it sent a note to the court asking, "Does the intent to kill have to apply to a specific person or persons." Defense counsel suggested that the court simply answer, "No." The court told the jury: "I would point out to you that nowhere in those instructions is there any reference to a specific person or persons."

Even though the court's response to the jury was, in substance, exactly what defendant asked the trial court to say, he asserts that the response was not only wrong but misleading. According to defendant, the court, in effect, told the jury that if it found defendant had the intent to kill *one specific person* (for instance Valarie Taylor, purportedly the intended victim in this case), that intent could be "transferred" to provide the requisite intent to kill for first degree murder for each of the four murder victims. We disagree.

The trial court's response that specific intent did not have to apply to a specific person or persons was a correct statement of law: It merely informed

the jury that when a defendant intends to kill one particular person, but kills someone else mistakenly believing the person killed to be the intended victim, the defendant has the requisite intent for first degree murder. (*People v. Suesser* (1904) 142 Cal. 354, 366 [75 P. 1093] [defendant had the requisite intent for first degree murder when, with the intent to kill X, he shot and killed Y in the mistaken belief that Y was X]; see *People v. Scott* (1996) 14 Cal.4th 544, 548-551 [59 Cal.Rptr.2d 178, 927 P.2d 288] [explaining the transferred intent doctrine].)

## I. *Denial of New Trial Motion*

On December 8, 1986, before submitting the issues of guilt and the multiple-murder special-circumstance allegation to the jury, the trial court explained the verdict forms and added this admonition: "One last point on the matter of the verdict forms. Once they are signed by the foreman and dated, they are cast in stone. So, if you have any question about the verdict forms, ask your question before you date and sign, the foreman, please, because once it's dated and signed, that's it."

On December 11, 1986, the jury sent a note asking, "Is it possible to return four guilty verdicts and find [the multiple-murder] special circumstance to be false?" In response, the court reread portions of its jury instructions, and also asked the jury foreman, John Porter, whether the rereading of instructions had answered the jury's question. Porter replied, "No, I don't think it does." This colloquy followed.

The court: "Let me ask you this, Mr. Porter, and I am going to ask you to be very careful and just answer my specific question and don't go beyond it. Have you taken any votes in this case, yes or no."

Mr. Porter: "Yes."

The court: "Have you, in your opinion, reached any conclusions on any of the counts in the case, whether you have actually signed a verdict form or not; yes or no?"

Mr. Porter: "Yes."

The court: "Is there any possibility you think the jury might decide this case or come in with some kind of verdict between now and four o'clock?"

Mr. Porter: "Yes."

After rereading additional instructions to the jury, the court asked the jury to return to the jury room. Just before 4:00 p.m., the jury came back into the

courtroom. The foreman gave the trial court another note, this one inquiring whether the phrase "intended to aid in the killing" in the special circumstance instruction meant "physically participating in the actual death." (See CALJIC No. 8.80 (1984 rev.).) After discussing the question with counsel at the bench, the court inquired whether the jury had reached a verdict on any of the counts. The foreman said that it had. The court then asked whether the foreman had signed the verdict forms, and the foreman again answered "Yes." The foreman gave four signed verdict forms to the clerk. The clerk read the verdicts aloud; each one was a guilty verdict for first degree murder. The court asked, "Are these your verdicts, so say you one, so say you all," and the jurors answered "yes" in unison. Defense counsel waived polling of the jury. The trial court then said to the jury, "The reason that I took the verdicts and had the clerk read them is to demonstrate to you that your decision on the special circumstance is a separate decision."

The following court day, the trial court answered "No" to the jury's question whether "intended to aid in the killing" in the special circumstance instruction meant "physically participating in the actual death." The court explained that the intent to kill requirement for the special circumstance allegation was the same as the intent to kill language in the jury instruction on aiding and abetting, but that the decision on the special circumstance was a separate decision. The jury then resumed deliberations on the special circumstance allegation, but was unable to reach a decision. The trial court declared a mistrial, discharged the jury, and set a date for retrial of the special circumstance allegation.

Defendant moved for a new trial on the guilt determinations, alleging jury misconduct (§ 1181, subd. 3) and verdicts decided by "means other than a fair expression of opinion on the part all of the jurors" (§ 1181, subd. 4). In support of the motion, defendant presented the declarations of Jurors Katharine Tripp, Robert Cole, and Margaret Byous. Each declaration stated that the jury never reached a verdict on any of the murder charges notwithstanding the foreman's signed verdict forms, and that the declarant had not come forward when the verdicts were delivered because of the trial court's admonition that a verdict reflected in a verdict form signed by the jury foreman was "cast in stone."

The trial court denied the new trial motion. It found the allegations in the jurors' declarations to be inherently unbelievable. The court noted that on several occasions throughout the trial the jury had been informed by the court and by counsel that it was not to consider the special circumstance allegation unless and until it returned a verdict of guilty on at least one count of first degree murder. The court added that when the jurors were asked

whether the four guilty verdicts for first degree murder were their verdicts, "I was looking, as I do all the time, directly at them, and every one of them said 'yes.' Every one of them said 'yes.' "

Defendant contends that the trial court erred in denying the new trial motion. He also asserts that it was error for the trial court to rule on the motion without conducting an evidentiary hearing, and to advise the jury that the verdict forms, once signed and dated, were "cast in stone." We reject these contentions.

We have held that the " 'determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' [Citations.]" (*People v. Cox, supra,* 53 Cal.3d 618, 694; *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221].) Here, there was no manifest and unmistakable abuse of discretion in the trial court's denial of the new trial motion. To the contrary, the trial court's decision that the verdicts were properly rendered was supported by abundant evidence.

There is no merit to defendant's assertion that the court was compelled to hear evidence before ruling on the new trial motion. We held in *People v. Hedgecock* (1990) 51 Cal.3d 395, 415 [272 Cal.Rptr. 803, 795 P.2d 1260] that "when a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court *has discretion* to conduct an evidentiary hearing to determine the truth of the allegations." (Italics added.) We stressed, however, that a "defendant is not entitled to such a hearing as a matter of right." (*Ibid.*) "Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Ibid.*) Here, the trial court could resolve any disputed factual issue without need for an evidentiary hearing.

Defendant argues that the trial court's comment to the jury that the verdict forms, once signed and dated, were "cast in stone" conflicts with three penal statutes (§ 1140 ["Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court."]; § 1163 [providing that either party can request polling of the jury]; and § 1164 [stating that if, after polling, "no disagreement is expressed, the verdict is complete"]), and with a Court of Appeal decision, *Chipman v. Superior Court* (1982) 131 Cal.App.3d 263, 266 [182 Cal.Rptr. 123], which states that "any juror is empowered to declare up to the last moment that he dissents from the

verdict." This contention is not properly before us because defendant never objected to the statement when it was made. (*People* v. *Anderson* (1990) 52 Cal.3d 453, 468 [276 Cal.Rptr. 356, 801 P.2d 1107].) Moreover, there is no reasonable probability that the outcome of the guilt phase trial would have been different absent the trial court's comment that the verdict forms once signed were "cast in stone." (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.) The jurors had the opportunity to disavow the signed verdict forms when the court asked them whether the four guilty verdicts for first degree murder were their verdicts, but no juror did so.

## V. RETRIAL OF THE SPECIAL CIRCUMSTANCE ALLEGATION; OMISSION OF THE INTENT TO KILL REQUIREMENT

Following the jury's inability to reach a verdict on the multiple-murder special-circumstance allegation, Judge Dion Morrow declared a mistrial on that allegation and discharged the jury that rendered the guilt verdicts. The case was thereafter assigned to Temporary Judge Florence Marie Cooper for retrial of the special circumstance allegation. The prosecution filed a motion entitled "Procedure for Special Circumstance Finding and Penalty Phase." In the motion, the prosecution asserted that the question of "intent to kill" had already been adversely determined against defendant when the guilt phase jury found him guilty as an aider and abettor on four counts of first degree murder. The prosecution sought a court ruling that at the special circumstance retrial it would not have to prove that defendant harbored intent to kill, and that the trial court would not instruct the jury on intent to kill. Over defendant's objection, the trial court granted the prosecution's motion.

The court impaneled a jury to try the multiple-murder special-circumstance allegation. At the trial, the prosecution called only a single witness, Elaine Kanase, the court clerk for Superior Court Judge Morrow, who had presided over the first trial. Kanase testified that she was present in Judge Morrow's courtroom during earlier proceedings in this case when the guilt phase jury returned verdicts finding defendant guilty on four counts of first degree murder. Those verdict forms were the only other evidence that the prosecution introduced.

The court then instructed the jury: "To find the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved: That the defendant has in this case been convicted of more than one offense of murder in the first or second degree." Thereafter, the court submitted the issue of the multiple-murder special-circumstance allegation to the jury, which found the allegation to be true.

Defendant argues that the instruction as given omitted a necessary element of the special circumstance finding for multiple murder: defendant's intent to kill. Defendant is correct, as the People concede.

California's capital penalty law provides: "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial . . . ." (§ 190.4, subd. (a), par. 1.) Furthermore, "[i]n any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all the special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues" relevant to the truth or falsity of the special circumstance allegation. (§ 190.4, subd. (a), par. 5.) Thus, in a case such as this in which the first jury fails to reach a verdict on the special circumstance allegation and that issue is retried before a different jury, our law requires the newly impaneled jury to determine the truth of any alleged special circumstance.

For defendant, tried as an aider and abettor and charged with the special circumstance of multiple murder for crimes occurring on August 31, 1984, the jury had to find that defendant had in the present proceeding "been convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).)[20] In addition, the jury also had to find that defendant acted with the intent to kill. (Former § 190.2, subd. (b); *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] [holding that "intent to kill" was a necessary element of the felony-murder special circumstance]; *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669] [extending the *Carlos* "intent to kill" requirement to the multiple-murder special circumstance]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149-1150 [240 Cal.Rptr. 585, 742 P.2d 1306] [overruling both *Carlos* and *Turner* and holding that "intent to kill is not an element of the multiple-murder special circumstance; but when the defendant is an aider and abettor rather than the actual killer, intent must be proved"].)[21] ▉ Here, the trial court at the special circumstance retrial instructed the jury that if it

---

[20]The current statute provides: "The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." The version of the statute in effect in 1984 at the time of the crimes in this case had slightly different phrasing: "The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree."

[21]Section 190.2, subdivision (c) now provides with regard to aiders and abettors: "*Every person, not the actual killer, who with the intent to kill*, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." (Italics added.) But intent to kill is no longer required

found that defendant had been convicted in this case of more than one offense of murder in the first or second degree, it could find the multiple-murder special-circumstance allegation to be true. The court omitted from the jury instruction the requirement of a finding by the jury that defendant acted with an intent to kill.

 We have consistently held that when a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*People* v. *Osband* (1996) 13 Cal.4th 622, 681 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People* v. *Johnson* (1993) 6 Cal.4th 1, 45 [23 Cal.Rptr.2d 593, 859 P.2d 673].) Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict. (*Chapman, supra,* at p. 24 [87 S.Ct. at p. 828].) Here, we cannot conclude beyond a reasonable doubt that the trial court's error in omitting from the instruction the requisite element of intent to kill did not contribute to the jury's verdict at the retrial of the multiple-murder special circumstance.

 In the past, we have held such error harmless when we were able to conclude that in determining the truth of the special circumstance allegation the jury had necessarily found an intent to kill under other properly given jury instructions. (*People* v. *Hardy, supra,* 2 Cal.4th 86, 192 [holding, with regard to codefendant Reilly, that the jury either found "that Reilly himself was the actual killer, or that he intentionally aided the actual killer in an intentional killing"]; see also *People* v. *Marshall* (1996) 13 Cal.4th 799, 849-852 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Here, however, the jury that rendered the verdict finding the existence of the multiple-murder special circumstance received no other instructions bearing on defendant's intent to kill.

 We have also held that error in failing to instruct on intent to kill with regard to a multiple-murder special circumstance to be harmless when the defendant's intent to kill the victims was "overwhelming," and the jury returning the special circumstance finding "could have had no reasonable doubt" that the defendant had the intent to kill. (*People* v. *Johnson, supra,* 6 Cal.4th at pp. 45-46.) Although the defendant in *Johnson* was tried as the perpetrator of the killings, we concluded that he was entitled to an instruction on intent to kill because his case fell within the so-called "window

---

of one who "with reckless indifference to human life and as a major participant" aids and abets one of the felonies enumerated in section 190.2, subdivision (a)(17). (§ 190.2, subd. (d).)

period" that occurred after this court's decision in *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131 [holding that intent to kill is an element of special circumstance allegations], but before we overruled *Carlos* in *People* v. *Anderson, supra,* 43 Cal.3d 1104. (*People* v. *Johnson, supra,* at pp. 44-45.) Based on the manner in which the defendant in *Johnson* had committed the two killings—strangling one victim and setting her on fire, and beating the second victim to death by inflicting 10 to 12 kicks to her head and face—we concluded that the jury, in finding the defendant had committed those murders, necessarily found that he had an intent to kill. (*Id.* at pp. 46-47; see also *People* v. *Osband, supra,* 13 Cal.4th 622, 681 [applying the *Johnson* analysis to the felony-murder special circumstances].) ▪ By contrast, here defendant was not the perpetrator of the murders but an aider and abettor; thus, the manner in which the actual perpetrator committed the murders (execution style) did not itself reveal an intent to kill by defendant as an aider and abettor. Moreover, because the "retrial" jury that found the existence of the multiple-murder special circumstance was never presented with any of the evidence regarding defendant's role in the murders, we cannot conclude here, as we did in *Johnson,* that the jury "could have had no reasonable doubt" that defendant had the intent to kill. (*People* v. *Johnson, supra,* at p. 45.)[22]

---

[22]Defendant contends that the evidence presented at the retrial was insufficient to sustain the multiple-murder special-circumstance finding. More specifically, he contends that the prosecution introduced no substantial evidence, and indeed no evidence at all, that he entertained the requisite intent to kill. We agree. After obtaining the trial court's ruling at the special circumstance retrial that proof of intent to kill was unnecessary because the guilt phase jury in the original trial had already resolved this issue against defendant, the prosecutor offered no evidence that defendant intended to kill any of the murder victims.

Does this insufficiency of the evidence preclude further retrial of the multiple-murder special-circumstance allegation? The United States Supreme Court has held that the federal Constitution's double jeopardy prohibition (U.S. Const., 5th Amend.) "forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding." (*Burks* v. *United States* (1978) 437 U.S. 1, 11 [98 S.Ct. 2141, 2147, 57 L.Ed.2d 1].) But the high court has also stated that the constitutional double jeopardy prohibition does not preclude retrial after reversal of a conviction for "trial error." (*Id.* at p. 15 [98 S.Ct. at p. 2149].) And, in a later case in which a defendant's conviction was reversed because of trial court error in admitting certain evidence of guilt, the United States Supreme Court held that the prosecution could retry the defendant for the same crime even though the evidence of guilt apart from the erroneously admitted evidence would have been insufficient to sustain the conviction. (*Lockhart* v. *Nelson* (1988) 488 U.S. 33, 39-40 [109 S.Ct. 285, 290, 102 L.Ed.2d 265]; see also *People* v. *Garcia* (1984) 36 Cal.3d 539, 557, 558, fn. 13 [205 Cal.Rptr. 265, 684 P.2d 826] [double jeopardy principles do not bar retrial after special circumstance finding is reversed for instructional error even though evidence of one element of special circumstance "may be insufficient"].)

Because the parties have not raised or briefed the issue, we decline to decide at this time whether the federal Constitution's double jeopardy prohibition, which applies to state court proceedings by virtue of the Fourteenth Amendment to the federal Constitution, prohibits retrial of the multiple-murder special-circumstance allegation in this case.

The People argue that the instructional error was harmless. According to the People, the question of intent to kill was necessarily determined adversely to defendant when the guilt phase jury found him guilty as an aider and abettor of four counts of first degree murder.

We disagree with the People that the guilt phase jury must have found that defendant had the requisite intent to kill when it found him guilty as an aider and abettor of four counts of first degree murder. The People point out that the prosecution's only theory in this case was that defendant shared the perpetrator's intent to kill everyone in the house. But, as explained previously, the trial court (Judge Morrow) also instructed the jury on an alternative theory of aider and abettor liability, namely, the natural and probable consequences doctrine. (See CALJIC No. 3.00 (1984 rev.).) A defendant guilty as an aider and abettor under the "natural and probable consequences" doctrine need not share the perpetrator's intent to kill. (See *People* v. *Prettyman, supra,* 14 Cal.4th 248.) Also, as we noted earlier, before and after the guilt phase jury returned verdicts of guilty on four counts of first degree murder, it asked the court several questions about the intent to kill requirement necessary to the multiple-murder special-circumstance allegation. Judge Morrow explained that the intent to kill requirement was identical to that set forth in the instruction the court gave on aiding and abetting, a modified version of CALJIC 3.01 (1984 rev.). The jury then resumed deliberations on the special circumstance allegation, but it was unable to reach a verdict. In light of Judge Morrow's jury instruction on the "natural and probable consequences" doctrine and the inability of the jury, after finding defendant guilty of four counts of first degree murder, to reach a finding on the multiple-murder special-circumstance allegation even after the court explained that the intent to kill requirement was the same as that for an aider and abettor who shares the perpetrator's intent, we cannot be certain that the jury in deciding defendant's guilt necessarily found that he harbored an intent to kill.

Consequently, we conclude that the trial court's omission of the intent to kill instruction at the retrial of the multiple-murder special circumstance was prejudicial error.

## CONCLUSION

The convictions on the four counts of first degree murder are affirmed. The multiple-murder special-circumstance finding and the judgment of death are reversed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I concur in the opinion of the court prepared by Justice Kennard.

I write separately in order to supplement what is there stated on the question whether the double jeopardy clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the due process clause of the Fourteenth Amendment, precludes a second trial for defendant on the multiple-murder special circumstance for purposes of death eligibility.

Without a doubt, we are compelled to find that the evidence introduced at the death-eligibility phase of defendant's trial, following the superior court's declaration of mistrial, was insufficient as a matter of law to support the jury's adverse determination on the multiple-murder special circumstance. In *People* v. *Turner* (1984) 37 Cal.3d 302, 328-329 [208 Cal.Rptr. 196, 690 P.2d 669]—which we would later overrule in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1149-1150 [240 Cal.Rptr. 585, 742 P.2d 1306]—we had held that intent to kill was an element of this special circumstance. At this phase of defendant's trial, there was no evidence on the issue whatsoever. "[T]he Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient . . . ." (*Burks* v. *United States* (1978) 437 U.S. 1, 18 [98 S.Ct. 2141, 2150-2151, 57 L.Ed.2d 1].)

There are, perhaps unsurprisingly, certain exceptions to this rule.

For example, the double jeopardy clause does not preclude a second trial if the prosecution failed to introduce sufficient evidence on an element at the first because the element in question had not yet been defined. (See *People* v. *Garcia* (1984) 36 Cal.3d 539, 557-558 [205 Cal.Rptr. 265, 684 P.2d 826].) At the death-eligibility phase of defendant's trial, the prosecution failed to introduce any evidence, sufficient or otherwise, on the intent-to-kill element of the multiple-murder special circumstance—even though it had introduced evidence of intent to kill earlier at the guilt phase and would also introduce evidence of intent to kill later at the penalty phase. Its failure cannot be excused by any absence of definition of an element. Intent to kill had already been held to be an element of this special circumstance in *Turner*, and had not yet been held *not* to be such in *Anderson*. "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." (*Burks* v. *United States, supra,* 437 U.S. at p. 11 [98 S.Ct. at p. 2147].)

The double jeopardy clause also does not preclude a second trial if the prosecution introduced sufficient evidence on an element at the first, but a

reviewing court subsequently concluded that a necessary part of such evidence was inadmissible. (See *Lockhart* v. *Nelson* (1988) 488 U.S. 33, 40 [109 S.Ct. 285, 290, 102 L.Ed.2d 265].) At defendant's trial, even though the prosecution had introduced evidence of intent to kill earlier at the guilt phase and would also introduce evidence of intent to kill later at the penalty phase, it did not introduce any evidence whatsoever on the intent-to-kill element of the multiple-murder special circumstance at the death-eligibility phase. Again, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." (*Burks* v. *United States, supra*, 437 U.S. at p. 11 [98 S.Ct. at p. 2147].) One might perhaps argue that the prosecution's failure to introduce evidence at the death-eligibility phase was invited by an erroneous ruling by the superior court that it need not do so. But the superior court's erroneous ruling was itself invited by a motion by the prosecution, which sought to avoid making proof.

That having been said, as the opinion of the court correctly notes, "the parties have not raised or briefed the [double jeopardy] issue . . . ." (Maj. opn., *ante*, at p. 690, fn. 22.) Because that is the case, I agree that it is appropriate to decline to resolve it here.

Appellant's petition for a rehearing was denied October 15, 1997.