Filed 3/6/13  P. v. Barron CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS FRANCISCO BARRON,<br><br>    Defendant and Appellant. | D061221<br><br><br><br>(Super. Ct. No. SCD230124) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

A jury convicted defendant Luis Barron of the first degree murder of Joanna Vargas (Pen. Code, § 187, subd. (a))[1] and assault with a firearm against Pierre Westbrooks (§ 245, subd. (a)(2)), and found true enhancing allegations that Barron discharged and personally used a firearm in connection with the crimes.  The court sentenced Barron to an indeterminate term of 50 years to life plus a consecutive

---

1    All further statutory references are to the Penal Code unless otherwise specified.

determinate term of 14 years.  Barron contends he was denied effective assistance of counsel because his attorney did not seek a voluntary intoxication instruction.

I

FACTS

A. The Assault

Around 12:30 a.m. on August 27, 2010, Westbrooks and Mr. Pope walked together to the front gate of their apartment complex on Van Dyke Avenue.  Pope noticed three males standing near a white SUV and, as Pope walked to his car, he heard someone say, "What's he looking at?" and saw Barron pull out a shotgun.  Pope jumped in his car and sped off.  As Pope drove away, the three men approached Westbrooks.  Barron (holding the shotgun) and his companions surrounded Westbrooks and said, "This is Mission Bay Locos" and called him a "fool."  As the men were standing around Westbrooks, a car drove up and a Hispanic male got out.  Barron's companions starting chasing the Hispanic male on foot, and that group disappeared around a corner as Westbrooks and Barron watched.  A few minutes later, the driver of the SUV (a female ) started the SUV, Barron got into the car and it drove away.  Barron did not smell of alcohol, and did not appear to be intoxicated or impaired.

B. The Murder

Around 1:15 a.m. that same morning, a white SUV approached Lindbergh Park.  About 15 seconds later, a gunshot rang out.  Joanna Vargas, who was at the park with Jose Flores and two others (including Mr. Cardenas), fell to the ground; Flores, who had been dancing with Vargas, felt something strike him.  After the shot, Cardenas saw the

2

SUV, with its headlights off and windows open, cruising past slowly. The SUV was occupied by three or four people.

By the time paramedics arrived around 1:30, Vargas was dead. She was killed by a shotgun slug that entered her back and partially exited her right chest wall.

C. Barron's Companions' Testimony

Around 8:00 p.m. on August 26, Mr. Zaragosa and Mr. Mendoza met Barron at the home of Barron's girlfriend (Ms. Ikonen) and the group consumed alcohol. Zaragoza testified he had four "glasses" of whiskey,[2] and also consumed two Xanax pills, and Barron drank about the same amount of alcohol. Mr. Mendoza testified he drank less than the others, drinking only two glasses of whiskey and (after the group took a break to go to the store to buy beer) later drank a beer. Mendoza saw Barron consume one Xanax pill. The group left the house around 9:30 p.m. because Barron wanted to acquire some spray cans of paint to go "tagging."

Mendoza testified the alcohol he consumed did not impair his faculties or awareness, and Barron did not appear to be falling down drunk or to slur his words during the course of the evening. Ms. Ikonen also testified Barron was not "particularly drunk," was not "stumbling over," and was holding a conversation without slurring his words.

Ikonen drove the group to Barron's mother's apartment in Ikonen's SUV. Barron went inside the apartment; Zaragosa and Mendoza got out and waited next to the SUV,

---

2      Zaragosa stated they drank from oversized coffee mugs, and each of the cups he drank was filled between half to three-quarters full.

and Ikonen remained in the driver's seat.  When Barron emerged and came back to the SUV, he was carrying a shotgun.  Ikonen, who had seen two men (Westbrooks and Pope) watching Barron return to the car, told Barron the two men had seen him.  Barron, Zaragosa and Mendoza then approached the two men and Barron "got into . . . one of the gentlemen's face" and appeared to be aggressively confronting him.  During the confrontation, Barron pulled out the shotgun and brandished it at one of the men, asking "Are you talking shit?" causing the man to back away.

At one point, Zaragosa saw Mendoza chasing another man while Barron remained standing with the black man.  When Mendoza returned, he, Barron and Zaragosa went back to the car and got in.  Barron told Ikonen to drive away, and at some point explained to her that the reason he had chosen not to "do something" was because the black man whom Barron was confronting was "an old man."[3]  Barron put the shotgun down on the floor of the car as they drove away.

Mendoza asked to be dropped off at his girlfriend's house, near the site of the murder.  As they drove past the park, Barron asked Ikonen to slow down.  Suddenly, Mendoza saw Barron pointing the shotgun out the window and heard the "boom" when he fired.  The others were startled, and were exclaiming "what the fuck," and "what's going on," but Barron told Ikonen to shut up and said "I think hit somebody" or "I think I just hit a girl."  Barron instructed Ikonen to stop the car, after which he opened the door,

---

[3]     Westbrooks was 49 years old at the time of trial.

got out and retrieved the shotgun shell. He then got back into the car and urged Ikonen to "go, go, go."

Ikonen drove to Ocean Beach near Sunset Cliffs before finally stopping. They threw the gloves Barron was wearing over the cliff, Barron hid the shotgun in a bush, and the group then drove off. After a short stop at an apartment where he conferred with a friend, Barron announced they were going to drive to Mexico and explained he wanted to get the car cleaned up to get rid of gunpowder traces. Once there, he let Mendoza and Zaragosa out to find their own way home, but not without warning them that "snitches get stitches," to deter them from reporting the incident.

Barron and Ikonen spent the night at Barron's father's house in Mexico while the car was being cleaned. Barron told his father that he had shot a girl. The day after the shooting, Ms. Campbell (who had a child with Barron) confided to a friend that Barron had phoned her, crying and hysterical, and told her "I didn't mean to shoot the girl. I meant to hit the boy."

II

ANALYSIS

Barron argues he was denied effective assistance of counsel because his attorney did not request a jury instruction on voluntary intoxication (CALCRIM No. 625), and there was a reasonable probability he would have obtained a more favorable result had the instruction been given.

5

A. <u>Legal Framework</u>

*Ineffective Assistance of Counsel*

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]' " (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

Where, as here, the record is silent on whether counsel might have had reasons for not requesting an instruction on voluntary intoxication, an appellate claim of ineffective assistance of counsel on direct appeal "must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) "A reviewing court will indulge in a presumption that counsel's performance fell within the

6

wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*Ibid.*)

*Voluntary Intoxication*

"[E]vidence of voluntary intoxication [can be] relevant on the issue of whether the defendant actually formed any required specific intent." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243.) Thus, in a homicide case, it may be relevant to the issues of premeditation and deliberation and intent to kill. (§ 29.4.) However, a trial court "has no duty to instruct sua sponte on voluntary intoxication." (*People v. Clark* (1993) 5 Cal.4th 950, 1022, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Rather, " '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.)

Importantly, " 'a defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent." ' " (*People v. Verdugo, supra,* 50 Cal.4th at p. 295.) Substantial evidence of intoxication alone is not enough; there must also be evidence that the intoxication impaired the defendant's ability to formulate intent. (*People v. Williams* (1997) 16 Cal.4th 635, 677-678.) The mere consumption of alcohol is not enough to warrant the instruction (*People v. Miller* (1962) 57 Cal.2d 821, 830-831 ["[t]he mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication"]), and the mere fact there was some level of inebriation does not warrant the instruction absent some additional

evidence the defendant was unaware of what he or she was doing because of intoxication. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 395 [testimony that as a result of drinking alcohol the defendant's speech was " 'weird,' " or he "had 'sort of a dreamy look in his eyes,' " or he was " 'in a daze, like spaced out' " was insufficient to warrant a diminished capacity instruction].).)

    B. <u>Analysis</u>

Here, although there was evidence Barron had been drinking alcohol earlier in the evening, the defense produced absolutely no evidence, from either lay or expert witnesses, that his drinking had any effect on his ability to formulate intent at the time of the shooting. To the contrary, the only evidence was that Barron had stopped drinking several hours before the shooting, and two of his coparticipants testified Barron did not appear "particularly drunk," was not "stumbling over," and was holding a conversation without slurring his words. Moreover, despite the alcohol consumption, Barron continued to manifest an ability *before* the shooting both to engage in purposeful and goal-directed behavior (e.g. by directing Ikonen to drive him to his mother's apartment where he was able to find and retrieve the shotgun inside the home) and to make decisions based on discrete and rational criteria (e.g. his decision not to escalate his assault on Westbrooks because Westbrooks was "an old man"). The evidence also showed he was able to engage in rational and goal directed-behavior *during, and in the immediate aftermath of, the shooting*: he directed Ikonen to "slow down" immediately before firing the fatal shot; he directed her to stop the car so he could remove evidence of his crime (the shotgun shell); he told her to "go, go, go" after returning to the car

8

(suggesting he was subjectively able to appreciate the need to escape); he twice stated "I think I just hit a girl," suggesting he was sufficiently sober that he could accurately perceive and recollect events; and he was able immediately to begin formulating and implementing a plan of escape (by ridding himself of the weapon and fleeing to Mexico to sanitize the escape vehicle). Finally, he admitted to Campbell he "didn't mean to shoot the girl [but instead] meant to hit the boy," suggesting his ability to engage in intended behavior was not impaired.

To establish a claim of ineffective assistance of counsel, Barron must show his counsel's conduct was deficient--that it fell below an objective standard of reasonableness under prevailing professional norms--and that he was prejudiced as a result, meaning a favorable verdict was reasonably probable had the instruction been given. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1158.) Because there was no substantial evidence his condition was significantly impaired (*People v. Miller, supra,* 57 Cal.2d at pp. 830-831), much less that the level of inebriation made him unaware of what he was doing (*People v. Carpenter, supra,* 15 Cal.4th at p. 395), there was insufficient evidence to support the instruction and therefore Barron's trial counsel did not provide ineffective assistance of counsel by not requesting the instruction. (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1173 [defense counsel not required to advance unmeritorious arguments].)

Separately, and alternatively, we also note the record is silent on why defense counsel did not pursue a voluntary intoxication defense at trial. When the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, a claim of ineffective assistance of counsel is more appropriately decided in a habeas

9

corpus proceeding, and the claim on appeal must be rejected unless there simply could be no satisfactory explanation for counsel's conduct. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) One plausible explanation for the dearth of lay or expert testimony to support a defense that Barron's drinking impaired his ability to formulate intent at the time of the shooting is that defense counsel *did* investigate that avenue and could find no testimonial support to undermine the evidence to the contrary. A second tactical reason for not proffering the defense could have been that counsel believed proffering an intoxication argument that it perceived to be a weak argument would have detracted from the defense theory of the case: that Barron specifically intended to shoot into a park he reasonably believed was empty of people, and it was a tragic accident that someone was present in a dark park after 1:00 a.m. to be hit by the shot. Because this theory of accident was the proffered defense, counsel could have reasonably believed that asserting Barron was too intoxicated to form any intent could have been inconsistent with this argument.

In *People v. Wader* (1993) 5 Cal.4th 610, the court rejected an ineffective assistance of counsel claim under analogous circumstances. There, defense counsel did not request the voluntary intoxication instruction, and instead proffered the defense that his intent when he fired the fatal shot was to scare the victim and nothing more. The *Wader* court rejected the ineffective assistance of counsel claim, stating "[a]n instruction on voluntary intoxication as negating specific intent would have been inconsistent with defendant's theory of the case. Accordingly, we cannot say that defense counsel had no rational tactical purpose in not requesting an instruction on intoxication." (*Id*. at p. 643.)

10

Because there are reasonable tactical explanations for counsel's decision not to request a voluntary intoxication instruction, Barron has not shown his counsel was ineffective on direct appeal and must pursue this claim by petition for writ of habeas corpus.

## DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.