Filed 5/23/24  P. v. Juarez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROMEO JUAREZ,<br><br>    Defendant and Appellant. | B330153<br><br>(Los Angeles County<br>Super. Ct. No. SA107261) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lana S. Kim, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In January 2023, appellant Romeo Juarez was convicted by a jury of first degree residential burglary with a person present, a specific intent crime. Three witnesses testified that, during and after the incident, Juarez seemed "off" and "out of it." Based on this testimony, Juarez requested the trial court instruct the jury with CALCRIM No. 3426, which states that a jury may consider a defendant's voluntary intoxication in deciding whether the defendant could have formed the requisite intent. The court refused, finding there was no evidence that Juarez was voluntarily intoxicated. Pursuant to Evidence Code section 352, the court also denied Juarez's request to play footage from an officer's body camera, which Juarez contended was further evidence of his intoxication.

On appeal, Juarez contends the trial court erred in both these decisions. He argues that the testimony that he seemed "off" and "out of it" sufficed to warrant an instruction on voluntary intoxication, and that the body camera footage was relevant and not unduly prejudicial. We disagree and therefore affirm.[1]

---

[1] Juarez also urges us to "analyze the prejudicial effect of the two errors together," contending that "if a single error alone is not sufficient to require reversal, reversal is required when the two errors are viewed cumulatively." Because we find Juarez failed to demonstrate either error, his claim of cumulative prejudice also fails.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In October 2022, Juarez was charged by information with one count of violating Penal Code section 459—first degree residential burglary with a person present.  He pleaded not guilty.  A jury trial occurred over three days in January 2023.

### A.  *First Day of Trial*

Leslie Adler testified that, in September 2022, after she returned to her Marina del Rey home, she opened the sliding glass door in her living room to let in some air, locked the sliding screen door, and went to the bathroom.  While in the bathroom, she heard a noise that she assumed was her husband and dog returning home; she believed her dog was waiting outside the bathroom door for her to emerge, as was his custom.  However, after she exited the bathroom, she did not see her dog, and went to the garage to look for him.  After entering the garage, she saw that her husband's car was not there, and then she heard a noise and saw Juarez rifling through the family's tools.  Leslie[3] asked Juarez who he was; Juarez responded by holding up a pair of bolt cutters and asking, "Can I have th[is]?"  Leslie said, "No," and asked who Juarez was and how he got in.  Juarez responded, "Well, I'm not the first one," which caused Leslie to believe there might be someone upstairs in the house.  Leslie left the garage, closing and locking the door to the garage behind her.  She then exited the home and called 911.  As she was on the phone with

---

[2] We limit our summary to the facts and procedural history relevant to the issues raised on appeal.

[3] Because two of the witnesses share a surname, we refer to them by their first names.

911, she noticed the screen door in the living room had been damaged.[4]

While Leslie was waiting for the police to arrive, she saw her husband Michael driving home and waved at him to come toward her, knowing that he would normally park in the garage. When Michael got to her, she informed him that someone had broken into their home and was still in the garage; Michael told her he had already opened the garage door. Michael parked and exited his car, ran to the street where the garage was, and saw Juarez walking out of the garage, carrying Michael's toolbox and a backpack. Michael asked what Juarez was doing with his stuff. Juarez stated, "What's the big deal? You're rich. You can just . . . buy more."

## B.    *Second Day of Trial*

### 1.    Body Camera Footage

At the start of the second day of trial, the People informed the court that Juarez's counsel intended to play video footage from an officer's body camera, and that the People objected to this both for lack of foundation and lack of relevance. Juarez's counsel countered that the footage was relevant because it showed Juarez "was drunk at the time" and also showed his "demeanor." Specifically, Juarez's counsel claimed the video

---

[4] A picture of the damaged sliding screen door was admitted into evidence as Exhibit 2. The screen portion of the door appeared disconnected from the left and bottom sides, creating a gap wide enough for a person to enter. While the exhibit was not included in the appellate record, we obtained it from the superior court and, on our own motion, augment the record with it.

4

would show Juarez's "slurred speech" and inability to stand up while "face planted into the dirt."  The court viewed the proffered footage and excluded it under Evidence Code section 352, stating: "I can't tell that he [Juarez] is intoxicated. . . .  It just shows him being arrested.  You can't see his face at any point in time."  After the court stated it could not tell how Juarez's "face got planted on to the ground" and "can't tell that the voice or his words are slurred" and thus "d[id]n't see the probative value," Juarez's counsel offered to "play more of the video where you can."  The court refused the request, stating it had already ruled.[5]

---

[5] The video footage was marked for identification as Exhibit A-1, but not admitted into evidence.  Although Juarez failed to include the footage in the appellate record, we obtained the exhibit from the superior court and, on our own motion, augment the record with it.  It is 70 seconds long and begins with Juarez face down in a mostly barren garden-like area next to a rough wall, with officers placing handcuffs around his wrists.  Throughout the video, officers repeatedly ask Juarez to stand up, and he refuses, saying (as best as we can discern) things such as: "No, I can't unless you understand it's safe."  "If they say it's cool, it's cool."  "Go figure out what's happening.  If it's cool, it's cool.  No, if it's cool, it's cool.  If not, my mom is going to die.  And then my parents are going to kill each other and then you're going to have two [unintelligible] dead."  "If you let my [unintelligible] die, you guys are bitches, man."  "Nah, dude, leave me where I am, it's cool."  At approximately 63 seconds in the video, officers begin hauling Juarez to his feet, and the footage ends with him standing upright and two officers holding him on either side.  While Juarez was not always intelligible, he did not sound as if he were slurring his words.  Nor did we perceive him being unable—as opposed to refusing—to stand up.

### 2.    Leslie Adler

On cross-examination, Leslie testified that Juarez seemed "off" and "out of it" to her that day. While she did not know whether he was intoxicated, she had a conversation with a police officer about him being drunk, or on drugs or some other substance, but also stated that his behavior "might have been normal for him." When a police officer tried to handcuff Juarez, it appeared that Juarez resisted by pulling away, and then fell over and "face planted" into the plants and dirt, where he stayed "for a while." At this point, Juarez's counsel informed the court that he would "like to play the video." The court held a discussion at sidebar with both counsel, reiterating that it had already excluded the footage, and had not changed its mind. The prosecutor added that the evidence should be excluded under Evidence Code section 352 "for a wide variety of reasons," arguing that the footage showed the officers using force without foundation for why Juarez was resisting arrest, and also showed Juarez "crying out in pain" and being "distraught" but only after the completion of the crime and thus did not demonstrate his state of mind at the time of the crime. The prosecutor concluded that whatever limited probative value the footage had was "clearly . . . outweighed by the prejudice of seeing [Juarez] in this state using the use of force [*sic*]." The court agreed.

### 3.    Michael Adler

Michael testified that, on the day in question, he was driving home and, as he neared his home, he opened the garage door with his remote. He then learned from Leslie that an individual had broken into the home and was still in the garage; Michael parked his car and saw Juarez exit the garage with Michael's tool chest. Michael asked Juarez what he was doing

with his tool chest; Juarez "mumbled something" in response. Michael shoved Juarez, who fell to the pavement, losing his grip on the tool chest; Michael retrieved it. Michael stood over Juarez and told him not to move. After Juarez got up and began walking toward an adjacent property, Michael noticed Juarez was carrying a backpack. Michael followed him and asked to see what was in the backpack. When Juarez stated his "stuff" was in the backpack, Michael threatened to push him down again and Juarez handed the backpack over; inside the backpack were Michael's bolt cutters.

On cross-examination, Michael agreed that Juarez seemed "off," "out of it," and not "quite right." However, Michael testified he did not know whether Juarez was drunk and could not say his speech was slurred.

### 4. Ian Clark

Clark testified that he had been a police officer for 17 years and was one of the officers who responded to the incident in question and who detained Juarez. Clark opined that Juarez "did not seem normal" that day, stating that he was "talking to himself," was "aggressive" and "not fully compliant when confronted by our armed officers," and was "difficult to communicate with." Clark elaborated that Juarez "might answer a question with an odd homey kind of impression [*sic*] or not at all" or "talk in circles." However, Clark did not smell alcohol on Juarez's breath and his behavior was not what Clark would associate with drunkenness. Clark stated he could not state whether Juarez was "high," because he "lack[ed] the expertise to tell the difference between someone who has[,] say[,] long term narcotics damage and someone who is currently high." Clark

7

explained that long-term narcotics users would "exhibit some behaviors and patterns of speech that the defendant did."

## C.   *Third Day of Trial*

### 1.   Jury Instructions

During a discussion about jury instructions, the court refused to include CALCRIM No. 3426 (Voluntary Intoxication), finding there was no evidence that Juarez voluntarily ingested any alcohol. Defense counsel countered that the testimony that Juarez "appeared to have been high" was enough evidence for a jury to infer Juarez was intoxicated. The court disagreed, reiterating "there was absolutely no evidence that the defendant was intoxicated or that he voluntarily consumed alcohol" and refused to include the requested instruction.

### 2.   Closing Arguments

During closing arguments, Juarez's attorney argued that Juarez did not necessarily intend to commit theft when he broke into the Adlers' home because "he was certainly out of his mind at the time." Counsel stated that he did not know if Juarez "was drunk or high or going through some kind of episode" or if he had "long term damage . . . from long-term drug use," but all witnesses testified that Juarez was "extremely off," talking to himself and responding to unasked questions.

### 3.   Verdict and Sentence

After less than an hour of deliberation, the jury found Juarez guilty. The court sentenced him to the upper term of six years but suspended the sentence and placed him on three years

of probation on the condition that he attend a residential treatment program. Juarez timely appealed.

## DISCUSSION

### A. *The Court Did Not Err in Refusing to Instruct on Voluntary Intoxication*

"A defendant is entitled to . . . an instruction [regarding voluntary intoxication] only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677 (*Williams*).) Juarez argues the court erred in refusing to instruct the jury using CALCRIM No. 3426 because "the uncontradicted evidence of three witnesses was that Mr[.] Juarez's conduct was that of someone who was under the influence of some intoxicating substance." "[A]ssertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.) We discern no error.

CALCRIM No. 3426 is entitled "Voluntary Intoxication" and instructs the jury that it is permitted to "consider evidence, if any, of the defendant's voluntary intoxication only . . . in deciding whether the defendant acted . . . with" the specific intent required for the crime. The instruction goes on to explain that "[a] person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect."

Juarez cites to the witnesses' testimony that Juarez was "off" and "out of it" and "didn't seem quite right." At most, such evidence may have supported an inference that some condition

9

was affecting Juarez's behavior or cognition. But to support the giving of CALCRIM No. 3426, the jury would have needed to infer that Juarez's not-quite-right behavior stemmed from intoxication instead of mental illness, long-term drug use, or some other cause; that Juarez voluntarily became intoxicated; and that Juarez knew or willingly assumed the risk that the substance he allegedly ingested would have an intoxicating effect. There was no evidence to permit the jury to make these inferences. (See *Williams*, *supra*, 16 Cal.4th at p. 677 [witness testimony that defendant was "probably spaced out" on morning of crime insufficient to warrant instructing the jury on voluntary intoxication].)

Moreover, even if the witnesses' testimony sufficed for a jury to conclude Juarez was intoxicated, there was no evidence to permit the jury to conclude that the alleged intoxication affected Juarez's formation of the requisite specific intent. (See *People v. Marshall* (1996) 13 Cal.4th 799, 847–848 [although there was evidence defendant was intoxicated, was feeling the effects of intoxication, " 'did not appear to be in a normal behavior [*sic*],' " and appeared "dazed" when arrested, voluntary intoxication instruction unnecessary because "evidence of the *effect* of defendant's alcohol consumption on his state of mind is lacking"].)

Juarez fails to demonstrate the court erred in refusing to instruct the jury with CALCRIM No. 3426.

### B. *The Court Did Not Err in Refusing to Admit the Body Camera Footage*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) Additionally, "[t]he court in its discretion may exclude evidence if its probative value is substantially

10

outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Juarez contends the court erred in refusing to admit the body camera footage because it was both relevant and more probative than prejudicial. "A trial court's determination regarding relevance is reviewed for abuse of discretion." (*People v. Oneal* (2021) 64 Cal.App.5th 581, 591.) Similarly, the determination as to whether the probative value of evidence is substantially outweighed by the possibility of unfair prejudice or misleading the jury is " 'entrusted to the sound discretion of the trial judge who is the best position to evaluate the evidence.' " (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097.) "A trial court's exercise of its discretion under section 352 ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1337, italics omitted.)

Having reviewed the video footage, we cannot find that the court acted in an arbitrary, capricious, or patently absurd manner in refusing to permit the footage to be played to the jury. The video began with Juarez already on the ground, without showing how he got there. While some of Juarez's statements on the video seemed nonsensical, he was not slurring his words— any unintelligible portions are reasonably attributed to the position of his face (which was in the dirt) relative to the camera. And the footage ends with the officers hauling Juarez to his

feet—there is no evidence that Juarez was unable to stand.[6] Thus, we hold the trial court acted well within its discretion in finding both that the video footage was not relevant and that, in any case, any potential relevance was substantially outweighed by the probability that its admission would create substantial danger of undue prejudice from seeing Juarez in this state (handcuffed and face down on the ground) without context of how he got there.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED



CHANEY, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.

---

[6] Moreover, given that he was standing in the Adlers' garage when Leslie first encountered him, and was able to exit the garage under his own power, it would be reasonable to conclude that any difficulty in standing that Juarez later encountered was due to being shoved to the ground by Michael, as well as "face-planting" into the ground while resisting arrest, and then having his hands cuffed behind his back.